LAKE SUPERIOR AND MISSISSIPPI RAILROAD COMPANY *v.* UNITED STATES.

ATCHISON, TOPEKA, AND SANTA FÉ RAILROAD COMPANY *v.* UNITED STATES.

1. A provision in an act of Congress, granting lands to aid in the construction of a railroad, that "said railroad shall be, and remain, a public highway for the use of the government of the United States, free from all toll or other charge, for the transportation of any property or troops of the United States," secures to the government the free use of the road, but does not entitle the government to have troops or property transported over the road by the railroad company free of charge for transporting the same.

2. Where, throughout an act of Congress, a railroad is referred to, in its character as a road, as a permanent structure, and designated, and required to be, a public highway, the term "railroad" cannot, without doing violence to language, and disregarding the long-established usage of legislative expression, be extended to embrace the rolling-stock or other personal property of the company.

APPEALS from the Court of Claims.

The first case was argued by *Mr. Walter H. Smith* for the appellant, and by *Mr. Solicitor-General Phillips* for the appellee. The second case was argued by *Mr. Thomas H. Talbot* and *Mr. E. R. Hoar* for the appellant, and by *Mr. Solicitor-General Phillips* for the appellee.

MR. JUSTICE BRADLEY delivered the opinion of the court.

Congress, in most of the legislative acts by which it, has made donations of the public lands to the States in which they lie for the purpose of aiding in the construction of railroads, has stipulated that the railroads so aided shall be public high-ways for the use of the government, free from all tolls or other charge for transportation of its property or troops. The question has arisen between the railroad companies owning these roads and the officers of the government, whether this reserva-tion includes the free use of the roads alone, or transportation also. The companies claim, that, if they give to the government the free use of their roads, it is all that is required of them. The government claims that it is entitled to have free transpor-tation on the roads, and that it is the duty of the companies to perform it; and Congress has refused compensation for such transportation, giving the companies, however, the right to appeal to the Court of Claims. That court having been applied to, and having decided adversely to the companies, they have appealed to this court, and the cases are now before us for consideration.

The manner in which the question arises is stated with sufficient accuracy by the counsel of one of the appellant companies, as follows: —

" Was the plaintiff, by reason of being a land-grant railroad, bound to transport the troops and property of the United States, free of charge, or had she a right to a reasonable compensation for such services. . . .

" The act of May 5, 1864 (13 Stat. 64), made a grant of land, in the usual form, to the State of Minnesota, to aid in the construction of plaintiff's road. That act contained the following provisions: ' And the said railroad shall be, and remain, a public highway for the use of the government of the United States, free from all toll or other charge for [upon] the transportation of any property or troops of the United States.' Sect. 5, p. 65. The seventh section provides; —

" ' That the United States mail shall be transported over said road, under the direction of the Post-Office Department, at such price as Congress may, by law, direct: *Provided*, that, until such price is fixed by law, the Postmaster-General shall have the power to deter-mine the same.'

" By the act of Congress of June 16, 1874 (18 Stat. 74), making appropriations for the army for the fiscal year ending June 30, 1875, it was provided, ' That no part of the money appropriated by this act shall be paid to any railroad company for the transportation of any property, or troops of the United States over any railroad which, in whole or in part, was constructed by the aid of a grant of public land, on the condition that such railroad should be a public highway for the use of the government of the United States, free from toll or other charge, or upon any other conditions for the use of such road for such transportation ; nor shall any allowance be made out of any money appropriated by this act for the transportation of officers of the army over any such road when on duty, and under orders, as a military officer of the United States.   But nothing herein contained shall be construed as preventing any such railroad from bringing a suit in the Court of Claims for the charges for such transportation, and recovering the same, if found entitled thereto by virtue of the laws in force prior to the passage of this act.' . . .

" The case turns upon the construction that should be given to the clause in the act of 1864, which declares that ' the said railroad shall be, and remain, a public highway for the use of the government of the United States, free from all toll or other charge for [upon] the transportation of any property or troops of the United States.' "

And the counsel for the appellants analyzes this provision as follows : —

" This is a legislative declaration of three things : 1. That *the railroad* shall be a public highway.   2. That the United States shall have the right to use the same for the transportation of its troops and property.   3. That the United States, in the transportation of its troops and property over such railroad as a public highway, shall not be required to pay toll or other charge."

It is somewhat singular that a provision apparently so simple in its terms should give rise to such a wide difference of opinion as to its true construction.   The difficulty arises from the peculiar character of a railway as a means of public travel and transportation.   The case of a turnpike or a canal would have furnished no difficulty whatever.   Those thoroughfares are usually constructed and owned by companies who have nothing to do with transportation thereon. They merely furnish

the thoroughfare. Had the provision in question related to public works of this kind, it would have been clear that the right reserved to the government would have been merely the right to use the works themselves (the turnpike or the canal) free from toll. The words " free from all toll or other charge for the transportation of property or troops " would have referred, by necessary implication, to transportation performed by the government itself, either in its own carriages or vessels, or in carriages or vessels procured and employed at its expense. No one would imagine for a moment that the turnpike or canal company would be bound to furnish the means of transportation, much less the propelling power and labor for performing it.

Indeed, Congress has, in several instances, commencing as far back as 1824, made donations of right of way, or grants of land, for canals and turnpikes, and has made almost the exact reservation contained in the railroad grants. The first was that made May 26, 1824, authorizing the State of Indiana to connect the Wabash River with the Miami of Lake Erie; and the reservation was in these words: " *And provided further*, that the said canal when completed shall be and for ever remain a public highway for the use of the government of the United States, free from any toll or charge whatever, for any property of the United States, or persons in their service in public business, passing through the same." 4 Stat. 47.

On the 2d of March, 1827, an act, with precisely the same reservation, was passed, making a grant of land to the State of Illinois, to aid in opening a canal to unite the waters of the Illinois River with those of Lake Michigan. 4 Stat. 234. On the 2d of March, 1833, an amendment to this act was passed, which declared " that the lands granted to the State of Illinois, by the act to which this is an amendment, may be used and disposed of by said State for the purpose of making a railroad, instead of a canal, as in said act contemplated; . . . *Provided*, that if a railroad is made in place of a canal, the State of Illinois shall be subject to the same duties and obligations, and the government of the United States shall be entitled to and have the same privileges on said railroad, which they would have had through the canal if it had been opened." Evidently the only thing reserved in this case was the use of the road.

It will be observed that the last-cited act was passed in 1833, when railroads were about being introduced as means of public communication in this country. It is undoubtedly familiar to most of those whose recollection goes back to that period, that railroads were generally expected to be public highways, on which every man who could procure the proper carriages and apparatus would have the right to travel. This was the understanding in England, where they originated. The Railway Clauses Consolidation Act, passed in 1842, provided in detail for the use of railways by all persons who might choose to put carriages thereon, upon payment of the tolls demandable, subject to the provisions of the statute and the regulations of the company. Acts of 5 & 6 Vict. c. 55. And suits were sustained to compel railway companies to keep up their roads for the use of the public. *King* v. *Severn R. Co.*, 2 B. & A. 646; *Queen* v. *Grand Junction*, 4 Q. B. 18; 2 Redf. sect. 249; Pierce's American Railway Law, 519. Most of the early railroad charters granted in this country were framed upon the same idea. Thus the charter of the Mohawk and Hudson Railroad Company, granted by the legislature of New York in 1826 (which was one of the earliest), after giving the company power to construct the road, provided as follows : —

" And shall have power to regulate the time and manner in which goods and passengers shall be transported, taken, and carried on the same, as well as the manner in which they shall collect tolls and dues on account of transportation and carriage, and shall have power to erect and maintain toll-houses and other buildings for the accommodation of their concerns." Laws of 1826, p. 289.

In subsequent charters, granted in 1828 and succeeding years, the intent is still more plainly expressed. Thus, in the charter of the Ithaca and Owego Railroad Company, it is provided : — ·

" Sect. 9. The said corporation shall have power to determine the width and dimensions of the said railroad ; to regulate the time and manner in which goods and passengers shall be transported thereon; and the manner of collecting tolls for such transportation; and to erect and maintain toll-houses, &c. Sect. 11. The said corporation may demand and receive from all persons using or travelling upon said rail the following tolls ; to wit, for every ton weight

of goods, &c., three cents per mile for every mile the same shall pass upon the said road, and a ratable proportion for any greater or less quantity; for every pleasure-carriage, or carriage used for the conveyance of passengers, three cents per mile, in addition to the toll by weight upon the loading.  Sect. 12. All persons paying the toll aforesaid may, with suitable and proper carriages, use and travel upon the said railroad, subject to such rules and regulations as the said corporation are authorized to make by the ninth section of this act."  Laws of 1828, p. 17.

Substantially the same provisions were contained in other charters granted in 1828 and 1829.  Laws of 1828, pp. 197, 228, 296, 307, 403, 474; Laws of 1829, p. 252.  In 1830 and subsequent years, an abbreviated formula was employed, but still apparently recognizing the possible use of the roads by the public; giving, amongst other things, express power to regulate the time and manner in which goods and passengers should be transported thereon, and power to erect toll-houses, &c.  So in the early charters granted by the legislature of Massachusetts, it was usual, after granting a toll upon all passengers and property conveyed or transported upon the road, to provide that the transportation of persons and property, the construction of wheels, the form of cars and carriages, the weight of loads, &c., should be in conformity to such rules, regulations, and provisions as the directors should prescribe, and that the road might be used by any persons who should comply with such rules and regulations.  This formula was continued down to 1835.  See 2 Railroad Laws and Charters, pp. 41, 60, 67, 77, 95, 103, 117, 124, 132, 141, 166, 195, 215.  Like provisions were inserted in various charters granted by the legislature of Maine, some as late as the year 1837; and in 1842 a general law was passed, requiring every railroad company whose road should be connected with that of another company to draw over their road the cars of such other company; and, on refusal so to do, the latter company was authorized to run its cars, with its own locomotives over such road, being subject to the general regulations thereof.  See 1 id. 8, 22, 60, 63, 77, 310.  Similar provisions as to the use of railroads by the public are contained in several early charters granted by the legislature of New Hampshire, coming down to a period as late as 1844.

Id. 325, 335, 343, 364, 378, 411. In that year a statute was passed, entitled " An Act to render railroad corporations public in certain cases," &c., by one section of which it was provided, that said corporations, whenever thereto required by the legislature, should permit all persons to run locomotives and cars on their road. Id. p. 648.

In New Jersey, not only did the railroad charters contain provisions similar to those above quoted with regard to the authority of the directors to regulate the construction of carriages to be used on their roads, the weight of loads to be carried, the times of starting and the rate of speed, but expressly declared that such roads should be public highways. See Charter of Camden and Amboy Railroad Company, Feb. 4, 1830. The charter of the New Jersey Railroad, passed in 1832, distinguished between tolls for transportation in the cars of the company and those of other persons; and provided that no farmer should be required to pay any toll for the transportation of the produce of his farm to market in his own carriage, weighing not more than one ton, when the load did not exceed one thousand pounds.

The charter of the Philadelphia and Trenton Railroad Company, granted by the legislature of Pennsylvania in 1832, expressly made the road a public highway, and contained various provisions adapted to a road of that character; and no doubt similar provisions were contained in other charters granted in that State.

In the case of *Boyle* v. *Philadelphia and Reading Railroad Company*, 54 Penn. 310, decided in 1867, the Supreme Court of Pennsylvania held that the charter of the latter company made the road a public highway, on which all persons might place vehicles of transportation on conforming to the regulations of the company; and that in limiting the amount of " tolls " demandable for transportation on the road, the legislature had reference to " tolls " charged to other parties using the road, and not to the freights or charges for transportation which the company itself was authorized to demand when performing transportation.

In Missouri, as late as the year 1847, the legislature, when incorporating the Hannibal and St. Joseph Railroad Company,

subjected it to the same restrictions and gave to it the same privileges before imposed and conferred on the Louisiana and Columbia Railroad Company, created in 1837 ; amongst which was the following : namely, " that the company should have power to prescribe the kind of carriage to be used on its road, by whom, whether to be propelled by steam or other power, all cars being subject to the discretion of the company, and no person to put any carriage on the road without its permission ; and the company was authorized to charge tolls and freight for the transportation of persons, commodities, or carriages on the road ; and it was declared that the State and the United States should have the right, in time of war, to use said road in transportation of troops or munitions of war in preference to all other persons." Missouri Railroad Laws, pp. 8–13. In reference to this railroad (among others), Congress, in 1852, made a grant of land to the State of Missouri, with the same reservation now under consideration, " that the said railroads shall be and remain public highways for the use of the government of the United States," &c. 10 Stat. 9. Read in connection with the charter of the railroad, which the rule relating to laws *in pari materia* requires, it is certain that, in this case at least, the reservation has relation to the use of the railroad alone, and not to the transportation service of the company.

On the other hand, in Maryland, from the first railroad charter granted in 1826, — namely, that of the Baltimore and Ohio Railroad Company, — the legislature has prohibited the use of railroads by any other company or person than the companies owning the same, except with their consent. But even this legislation is a recognition of the distinction between the railroad considered as a structure adapted to general use, and its actual use by placing vehicles and conducting transportation thereon. See Laws of Md. 1826, c. 123, sect. 18, and charters in subsequent years in the Session Laws.

It is undoubtedly true, that, in practice, railroads, as a general thing, are only operated by the companies that own them, or by those with whom they have permanent arrangements for the purpose. These companies have a practical, if not a legal, monopoly of their use. The great expense of constructing and

managing cars and motive power fit to be used on railroads as they have actually developed, the difficulty of strict compliance with the regulations adopted, and the diversified ways in which the companies could make the transportation business uncomfortable to those who might attempt to carry it on, are a most effectual security against any interference with their business as carried on by themselves. And in some of the States where railroads were originally declared public highways, the right of the public to use them has been expressly abrogated, — as in Massachusetts, for example, by the act of 1845. See Railroad Laws and Ch. 648.

But the ascertained impracticability of the general and indiscriminate public use of these great thoroughfares does not preclude their use by transportation companies having no interest in the roads themselves. Such companies, in fact, are actually engaged in conducting a vast carrying business on the principal lines of railroad throughout the country. Nor does it preclude the idea, that it may be of great importance to the government, in conducting its various operations in peace and in war, to have the free use of railroads as thoroughfares whenever it chooses to assume the conduct and management of its own transportation thereon.

Be this, however, as it may, the general course of legislation referred to sufficiently demonstrates the fact, that in the early history of railroads it was quite generally supposed that they could be public highways in fact as well as in name. This view pervaded the language of most charters granted at that period, many of which still remain in force; and the railroads constructed under them are, theoretically at least, public highways to this day. This fact affords the only explanation of much of the language used, not only in those early charters, but in many of those which have been granted since, the latter adopting, as was natural, the forms of phraseology found prepared to hand. The language referred to is only consistent with the idea that railroads were to be regarded and used as public highways. The forms of legislative expression thus adopted, and coming down from a period when they had greater practical significance than they now have, bring with them an established sense, which renders them free from all uncertainty and doubt. We

know, as well as we know the sense of any phrase in the English language which has a historical meaning and application, what is meant when a railroad is spoken of in a law as a "public highway." We know that it refers to the immovable structure stretching across the country, graded and railed for the use of the locomotive and its train of cars.

But it is not alone in charters which contemplate the creation of railroads as public highways that we find evidence of the understood distinction between railroads as mere thoroughfares, and the operations to be carried on upon them by means of locomotives and cars. This is manifest from the fact, amongst other things, that express power is invariably given (if intended to be conferred) to the railroad company to equip its road, and to transport goods and passengers thereon and charge compensation therefor. This practice evidently springs from the conviction that a railroad company is not necessarily a transportation company, and that, to make it such, express authority must be given for that purpose, in compliance with the rule that no power is conferred upon a corporation which is not given expressly or by clear implication.

In view of the legislative history and practice referred to, it seems impossible to resist the conclusion, when we meet with a legislative declaration to the effect that a particular railroad shall be a public highway, that the meaning is, that it shall be open to the use of the public with their own vehicles; and that when Congress, in granting lands in aid of such a road, declared that the same shall be and remain a public highway for the use of the government of the United States, it only means that the government shall have the right to use the road, but not that it shall have the right to require its transportation to be performed by the railroad company. And when this right of the use of the road is granted "free from all toll or other charge for transportation of any property or troops of the United States," it only means, that the government shall not be subject to any toll for such use of the road. This, we think, is the natural and most obvious meaning of the language used, when viewed in the light afforded by the history of railroad legislation in this country.

This was also the interpretation put by the Executive De-

partment of the government upon the reservation in question prior to the passage of the acts of 1864.   At the breaking out of the late civil war, it became a matter of great practical importance to the railroad companies which had received grants of land subject to this restriction, whether they were or were not to receive any compensation for transporting government property and troops in their cars.   It was held that they were, and that a reasonable abatement should be made for the free use of the road, to which the government was entitled.   The views of the War Department were set forth in a communication from Mr. Cameron, Secretary of War, to the president of the Illinois Central Railroad Company, dated Aug. 15, 1861, in which he says, " It has been decided by this department that the clause in your charter (9 Stat. 467, sect. 4) gives a clear right to the government of the United States to the use of your roadway, without compensation, for the transportation of its troops and its property.   As a proper compensation for motive power, cars, and all other facilities incident to transportation, two cents per mile will be allowed for passenger travel, subject to a discount of thirty-three and a third per cent as due to government for charter privileges.   Payment for transportation of freights, stores, munitions of war, and other public property, will be made at such reasonable rates as may be allowed railroad companies, subject, however, to the abatement of thirty-three and a third per cent, as before specified."   A movement to compel the same company to transport property for the government free of charge was made in 1865; but was reported against adversely by learned committees, after receiving from the War Department a full explanation of the reasons upon which its action had been based.   See letter of Q. M. Gen. Meigs to Senator Sherman, dated Feb. 14, 1865, and the action of the Senate and House of Representatives, 2d Sess. 38th Congress, Cong. Globe, vol. lxviii. pp. 890–902, 1045, 1387–1389.   The same views were fully expressed by the Attorney-General, when applied to for his opinion, in 1872. 14 Opinions, 591.   In accordance with these views, settlements were made with the different companies concerned down to the passage of the act of 1874, suspending payment, as before stated.

It is not without significance, in this connection, that in other grants, when Congress intended to provide for transportation being performed by the railroad company, explicit and proper language is used for that purpose. As in the case of the Union Pacific Railroad Company, chartered by Congress July 1, 1862, where it is enacted that the company shall transmit despatches over its telegraph lines, transport mails, troops, and munitions of war, supplies, and public stores, upon its railroad, for the government, whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid, at fair and reasonable rates of compensation, not to exceed the amount paid by private parties for the same kind of service. 12 Stat. 493. In this case compensation was provided for. In other cases the transportation was to be furnished without charge. After the discussion in 1865, before referred to, Congress made several grants of land, with the express reservation that the government property should be transported over the roads concerned at the cost, charge, and expense of the company owning and operating the same, when required by the United States so to do, using language entirely different from that under consideration in the cases now before the court. See acts of 1866 (14 Stat. 95, 237, 241, 290, 338, 549).

But suppose, in the cases under consideration, the States of Kansas and Minnesota, to which the land-grants were directly made, had themselves severally chosen to construct the railroads in question, to be operated and used by any individuals or transportation corporations who might see fit to place rolling-stock thereon upon payment of the proper tolls, would the government have had any further right than that of using the road with its own carriages free of toll? It certainly could not have the right to use the carriages of third persons placed on the road; nor, from any thing contained in the act of Congress, could it require that the State should procure and place rolling-stock on the road. All that the act reserves is the free use of the railroad. Of course this implies, also, the free use of all fixtures and appurtenances forming part of the road, and which are essential to its practical use, such as turn-

tables, switches, dépôts, and other necessary appendages. Lord Chancellor Cottenham, in the case of *Cother* v. *The Midland Railway Company*, 2 Phill. 473, said, "The term 'railway,' by itself, includes all works authorized to be constructed; and, for the purpose of constructing the railway, the company are authorized to construct such stations and other works as they may think proper." 1 Redf. on Railw., sect. 105. The "works" referred to by the Lord Chancellor were those permanent and immovable appendages which constitute parts of the completed structure.

We are of opinion that the reservation in question secures to the government only a free use of the railroads concerned, and that it does not entitle the government to have troops or property transported by the companies over their respective roads free of charge for transporting the same.

In coming to this conclusion, we do not place any great stress upon the use of the word "toll," as being a word peculiarly applicable to charges for the use of a highway, as contradistinguished from the charge for transportation, which is more properly denominated "freight;" for whilst this is undoubtedly true, it must be conceded, that, in the actual language of railroad legislation, the word "toll" is very often used to express the charge for transportation also. Our opinion is based rather upon that marked distinction which the mind naturally makes, and which is so generally made in railroad legislation between the road as a thoroughfare and the transaction of the carrier business thereon, whether by the railroad company itself or by other persons, and the manifest intent of Congress, in the legislation under review, to reserve only the free use of the road, and not the active service of the company in transportation.

The objection that it would be inconvenient for government to provide locomotives and cars for the performance of its transportation cannot be properly urged. The government can do what it always has done, without experiencing any difficulty, — employ the services of the railroad and transportation companies which have provided these accommodations. It might be very convenient for the government to have more rights than it has stipulated for; but we are on a question of construction, and

on this question the *usus loquendi* is a far more valuable aid than the inquiry what might be desirable.

Equally untenable is the idea, that, because railways are not ordinarily used as public highways, therefore the appellation of "public highways," when given to them, must mean something different from what it has ever meant before, and must embrace the rolling-stock with which they are operated and used. Such a method of interpretation would set us all at sea, and would invest the courts with the power of making contracts, instead of the parties to them. It is contended by the government, that though it be not entitled to the active services of the company, but only to the use of the "railroad," that, at least, this term (railroad) must be regarded as including the equipment of the road as a part thereof, and that the government should be adjudged to have the free use of the locomotives and cars of the company, as well as the track. But, as suggested, we cannot see any good reason for this position. No doubt the word, as used in certain connections and in particular charters and instruments, may properly have a wider latitude of signification, so as to include the equipment and rolling-stock as accessory to the track, constituting together one incorporated mass or *corpus* of property as the subject-matter of the particular enactment or disposition. It is not our purpose to question the propriety of this view in the cases and for the purposes to which it may be applicable. But where, as in the laws under review, the railroad is referred to throughout in its character as a road, as a permanent structure, and designated and required to be a "public highway," it cannot, without doing violence to language, and disregarding the long-established usage of legislative expression, as shown in the previous part of this opinion, be extended to embrace the rolling-stock or other personal property of the railroad company.

The decrees of the Court of Claims in the several cases must be reversed, and a new decree made in favor of the respective petitioners, in conformity with the principles of this opinion; that is to say, awarding to each of them compensation for all transportation performed by them respectively of troops and property of the government (excepting the mails), subject to a fair deduction for the use of their respective railroads.

MR. JUSTICE MILLER, with whom concurred MR. JUSTICE CLIFFORD, MR. JUSTICE SWAYNE, and MR. JUSTICE DAVIS, dissenting.

I propose to state briefly the reasons why I cannot concur in the judgment of the court in these cases.

The grants of lands to these railroads are of great value, and were made before a single dollar was expended in their construction, and were so necessary to the success of these enterprises, that it may be safely assumed that the roads would not have been built without them.

The only compensation, which can properly be so called, to the United States, is found in the following proviso to the third section of the grant to the Atchison, Topeka, and Santa Fé Railroad Company : " The said railroad and branches shall be and remain public highways for the use of the government of the United States, free from all toll or other charge upon the transportation of any property or troops of the United States." 12 Stat. 773.   This act was passed in 1863 ; and a grant to the other company, passed in 1864, contained a proviso in the same words, with the substitution of the word " for " in place of the word " upon " preceding the word " transportation."

The only question in these cases is, What right or privilege did Congress intend to secure to the government by this proviso ?

Notwithstanding the argument, built upon the assertion that railroads in England were first used as other roads by the persons who used them furnishing their own vehicles of transportation, and, perhaps, motive power, and that there may possibly exist at this day one or two short railroad tracks connecting coal-mines with other railroads, on which each mining company furnishes its own cars and locomotives, I venture the assertion, that there does not now exist in the United States, and has not ever existed, any railroad track over which the general public actually ran, each man for himself, his own cars propelled by his own locomotives, and managed and controlled by his own conductors, engineers, brakesmen, &c.   In short, I deny that at the date of these grants there was in existence any practicable system anywhere in the United States by which the government or any one else could use the track of a railroad,

without using its usual and necessary appurtenances; namely, its cars, locomotives, dépôts, agents, officers, and servants.   I will not discuss the proposition, because its truth or falsehood is open to the observation and experience of all men who know any thing of the present railroad system of the world.

It follows, that if the United States secured any thing by the proviso, the use of the road by the government, for which no toll or other charge was to be made, must be the only use which is at all practicable, and the same use which is made of it by all others who have occasion to employ it.

Nothing is gained in the argument by the criticism on the phrase, " public highway for the use of the government."   Railroads, such as we have described them, and limited in the manner of their use to their own rolling-stock, managed by their own officers, are, if not technically so, really public ways.   They exist nowhere except by statutory authority of the government. They would not be tolerated for a moment in any State of the Union, unless they were free in some mode of use to all the public.   They no more dare to refuse to transport persons and property of the general public over the whole or any part of their road, than a ferryman would refuse to do the same thing over his ferry.

They have received grants, corporate subscriptions, and municipal gifts, on the ground that they are for the public use, which could be valid on no other ground.   *Loan Association* v. *Topeka*, 20 Wall. 661.   And they are subject to such legislative regulations as are ferries, bridges, turnpikes, and other public means of conveyance and transportation, where they have secured no restriction on this legislative power either by contract or by constitutional provision.

The words " public highways for the use of the government " only express that the roads are to be open to the use of the government as to others, and are introductory to the modification of the terms on which this use is by the contract conceded to the United States; namely, that it is to be " free of toll or other charge upon the transportation of any property or troops of the United States."

Much stress in the argument of counsel is laid upon the word " toll," which, it is said, is inapplicable in any other sense than

a charge for the use of the road-bed. If we should concede this, it would advance the argument but little; for the use of the road is to be free from toll or other charge on transportation. Now, what is suit brought for in these cases but for a charge for transportation, — a charge upon transportation by these companies? If it is not a toll, it is another charge for transportation. If it is a toll, it is equally to be free.

But the word "toll" has never been restricted to the limited sense here contended for.

In 6 Com. Dig. 349, art. "Toll" a "toll thorough," which is the class of tolls relating to ways, is said to be "a sum demanded for a passage through a highway or for a passage over a ferry." In the case of the ferry, it surely will not be said that the toll is for the use of the river; nor will it be denied that it is for transportation over the river by means of the ferryman's boat, his labor, and if it be in a steamboat, it is the very class of means used by a railroad company. A "toll thorough," then, as understood at the common law, did include compensation for something more than the use of a road-bed or a water-way, and did include, when applied to a proper case, compensation for the means of locomotion and transportation used by the party who claimed the right of toll.

So, also, "toll" is the word used to express the compensation allowed by law or custom to a miller for grinding grain. 2 Bouv. Law Dict. 598. Now, the motive power of ancient mills in England was principally the water of rivers or other streams, and the owner of the grain did nothing but to bring his grist to the mill and carry it away. It is true that in this country there is, and has been, a class of mills run by horse-power, where the owner of the grain furnished the horses, and the other party the mill; and in these, also, the compensation is called by both statutes and customs, "toll." These instances are sufficient to show that neither by the common law of England, by its statutes, nor by customary usage there or in the United States, is the word "toll" limited to compensation for the use of a road, a way, a mill, or a ferry, where the moving power comes from the party using it; but, on the contrary, that it is and always has been applied to compensation for such use when the thing used, and the motive power by which it was used,

came from the party charging the toll, as well as when it came from the party paying it.

It is, therefore, a word properly used to express the charges made by railroad companies for transportation of persons and property in the manner which is now usual, and, I may add, universal.

We are seeking to ascertain the meaning which the Congress of the United States attached to a certain form of words; and if that body had, before the use of the words in the two statutes which we are construing, made any public and official declaration of the sense in which they used them, both the grantees in these later statutes, and this court, must be bound by that declaration.

The form of proviso under consideration had been adopted in many previous grants of land for railroad and other purposes; among others, in 1852, to the State of Missouri, for the Hannibal and St. Joseph and the Pacific Railroad.

Upon the outbreak of the rebellion these roads suffered very much from the intestine war of the State, and were called upon almost beyond the extent of their ability for transportation of troops, food, and munitions of war, for the government of the United States. It was found that if they were to do all this without compensation they would soon be bankrupt, and had better abandon their property to the government.

In view of this great hardship, unanticipated by any one at the date of their grants, Congress made provision by the joint resolution of March 6, 1862 (12 Stat. 614), for an equitable arrangement by which the companies could discharge some portion of their obligation, and yet receive from the government such compensation, during the existence of the war, and in view of the public exigency, as might be just and reasonable. But the preamble declared, that in doing this they did not waive the right of the United States to have their property and troops transported free from toll or other charges of said railroad, as contemplated by the provisions of the grant already referred to.

Here was, in 1862, — the year before the first of the grants under consideration was made, and two years before the other, — a declaration by Congress, placed on the statute-book, that

they understood and claimed that this form of words gave them the right to have all their troops and property transported by these companies free of charge; and that as full performance was, in the condition of things at that time, impossible, they waived the exercise of that right as long as the war lasted, and would make a provisional arrangement for that time to enable the companies to get along.

Were not the parties who received and acted upon grants made the next year bound to know and understand the sense in which Congress used this form of words? Can they now be heard to say that another and far different meaning was attached to them by Congress from that which the same body asserted for them a year before? If they did not wish to accept the grants under that construction, they need not do it. But if they did accept them, and have sold the land, they are bound by the public statutory construction previously given by Congress of the meaning which they attached to the words used in the grants. For these reasons, I am of opinion that the judgment of the Court of Claims ought to be affirmed.