Davis, J.,
delivered the opinion of the court.
These cases are sent to this court by the Postmaster-General for decision under the authority derived from section 1063 of the Revised Statutes. It was assumed in the argument that the same principles may'- govern the two decisions. It is therefore found convenient to treat them together.
The Philadelphia, Wilmington and Baltimore Railroad is a trtmk road, connecting Philadelphia with Baltimore by way of Chester and Wilmington.
*202 At Chester, fourteen, miles from Philadelphia, a line of railways fifty-nine miles in length, partly owned and entirely operated by the Philadelphia and Baltimore Central Railroad Company, joins the main line on the western side, and connects it with Port Deposit, to the westward, in Maryland.
At Wilmington, twenty-eight miles from Philadelphia, a line of railways ninety-seven miles in length, owned by the Delaware River Railroad Company, and leased and operated by the Philadelphia, Wilmington and Baltimore Railroad Company, joins the main line on the eastern side, and connects it with Delmar, in the southern part of Delaware.
Thus three distinct avenues of traffic enter Philadelphia on the same rails: 1st, the line to Baltimore; 2d, the line to Port Deposit; and, 3d, the line to Delmar. Continuous trains are run on these avenues from the common center at Philadelphia, over common portions of the main trunk, and thence to Baltimore, to Port Deposit, and to Delmar. On each line the continuous train serves the stations on the common part of the line as well as on its own exclusive line.
Each of the companies referred to has been for many years a carrier of the mails. The main trunk of the Philadelphia, Wilmington and Baltimore road was known in the Post-Office Department as route No. 3501, and as such, prior to July 1,1873, received mails and was paid for them transportation along the whole route from Philadelphia to Baltimore. The Delaware Railroad was known there as route No. 3401, and the company operating it received mails prior to July .1,1873, and was paid for transporting them between Wilmington and Delmar. The roads operated by the Philadelphia and Baltimore Central Railroad Company were known there as route No. 2408, and that company, prior to July 1, 1873, received and transported mails between Chester and Deposit, and was paid for such transportation. Under the contracts and system which then prevailed, the Philadelphia, Wilmington and Baltimore Company carried the mails destined for Port Deposit and Delmar, respectively, to the proper junction on its own route, there delivering them to the proper branch road, and was paid accordingly.
On the 1st day of July, 1873, a new system came into operation, and changes took place in the mode of transporting mails between Philadelphia and Port Deposit and Delmar, respectively.
*203 By the Act of March 3, 1873, the Postmaster-General was directed to readjust the compensation to be paid on railroad routes, so as to secure transportation with frequency and speed in cars or in apartments in cars properly lighted and warmed, so as to allow mail-agents to travel in charge of mails and to distribute them. In order to induce the railroad companies to furnish this accommodation, the Postmaster-General was directed thereafter to pay to such companies as might furnish it a yearly compensation to be determined by the average weight of mails per day carried over the whole route, the lower averages receiving a much greater proportionate sum than the higher ones. A mode was provided for ascertaining these averages by actual weight.
The Postmaster-General called upon the respective parties to these suits to furnish the service indicated by this act, and it was furnished. On the 1st day of .July, 1873, postal cars, or postal apartments in cars, according to the requirements of the service, in charge of mail-agents, commenced ruiming in continuous trains both ways between Philadelphia and Baltimore, Philadelphia and Port Deposit, and Philadelphia and Delmar. This service was furnished from the 1st July, 1873, to the 7th March, 1877, both inclusive, when it was withdrawn from the Delmar and Port Deposit lines in consequence of disagreement with the Government about pay. Bach of these continuous trains did mail-service in a greater or less degree for the common portion of the route.
The Post-Office Department, in its dealings with the claimants after July 1,1873, treated the old routes as remaining unchanged under the new arrangements. The Philadelphia and Baltimore road ivas still regarded in its entirety as route No. 3501, and all mail matter passing o\Ter it, as well that on trams for Delmar and Deposit as that on its own local and through, trains, went to SAvell the aggregate by which the average weight of through transportation of that company on its whole road was determined and paid. Route 3401 was still regarded as terminating at Wilmington, and transportation upon it was paid for up to that point only; and in like manner route No. 2804 was regarded and paid for as still terminating at Chester. If the mails to and from the branches had been taken out from the aggregate of the mails on the main line, and treated as carried to and from. Philadelphia and the respective junction by independent lines, *204 ibe compensation for their transportation would have been considerably increased, since their daily average over the main line would have been measured by a lower gradient in the scale of weight, with a corresponding higher gradient on the scale of pay.
It does not appear that either claimant objected to the department’s theory of service before May 15,1874. The Philadelphia, Wilmington and Baltimore Company then claimed to be paid for the transportation of the Delmar mails, upon the theory that the service began at Philadelphia and not at Wilmington, and that the route was therefore, fi-om Philadelphia to Delmar. It also at the same time put in a claim for pay for transportation of the Port Deposit mails over its main line, founded upon a like theory. These claims were rejected by the department.
On the 4th December, 1875, the Philadelphia and Baltimore Central Company set up that it was entitled to compensation for its Port Deposit mail as a through mail from Philadelphia. This claim was in like manner rejected.
From the time when each claimant thus set. up its claim, it does not appear that either acquiesced in the department’s construction of the law and of the service rendered. The present suits are brought to enforce the pretensions thus set up in 1874 and 1875 respectively.
The defendants, on their side, contend that the term post-route, as used in postal statutes, refers to routes established and recognized in the department. They say that “ post-road” is the term used to designate a highway, whether by land or by water, over which any mail may lawfully travel; and that by u post-route” is signified a post-road or roads, or portions thereof between definite limits, over, which the transportation of mails usually forms the subject of a separate contract. When, therefore, the Act of 1873 directed the Postmaster-General thereafter to readjust the compensation for transportation of mails on railroad routes, it intended to refer only to railroad routes recognized by the department, and did not authorize the extension of routes 2804 and 3401 to Philadelphia.
Prior to the consolidation Act of June 8,1872, the two terms appear to have been used indiscriminately in the statutes. That act apparently gives ground for the contention of the Government. For the present purposes, however, it is of little consequence whether the alleged distinction does or does not exist. *205 The Act of 1873 is the controlling statute here, and the end sought for in the provisions of that act is plain. It aimed to secure the transportation of mails in closed cars, under charge of mail-agents, on continuous routes. It did not create a new postal route. It did not interfere with the right which the Postmaster-General had before the passage of the act to define and establish new postal routes, as the Government defines that term, or to increase or curtail old ones. It left him free to arrange for such transportation of mails on existing routes, if possible. If the desired accommodations could not be secured on existing railroad routes, it did not prevent him from creating new routes in order to secure them. Any other construction would strip the act of its efficiency.
The defendants further contend, if their argument is correctly understood, that when a railroad is once registered in the department as a route, it is impossible to locate another route over' the same track. It is said, for instance, that route No. 2408 being one route, and route 3501 being another route, the Postmaster-General cannot extend 2408 over any portion of 3501, even though the company owning the former may actually por-form mail-service over the latter.
• This position is taken in apparent disregard of established usage in all parts of the country. Railroads were first proj ected for comparatively short distances from one center of population to a neighboring center; as, for instance, from Liverpool to Manchester, from Boston to Providence, from New York to New Brunswick, &c.; and it was then supposed that the public would use the new avenues as they used canals and highways. The termini of the early roads throve and increased under the stimulus. As they advanced in population, and as wealth correspondingly increased, the railroads in turn took a portion of the urban population to rural' sites upon their lines. People whose means would no longer enable them to live with their accustomed comfort in the cities, where their business lay, were compelled to seek new homes in accessible localities in the neighboring country. Thus not only was the expense of obtaining terminal facilities in large cities greatly increased for new enterprises, but the cost of approach to such cities was also much enhanced. Under these circumstances smaller and less important roads in all sections of the country put in practice the idea with which railways were originally constructed, by contracting for the *206 passage of their trams over the rails of existing roads at an agreed toll. Without some such arrangement it would have been impossible to construct many lateral roads. To regard a train of a railway company, equipped and manned by its own servants, and hauled by its own engines over another road to a. terminal station in which it hires cár-room and platform-room, as the train of a company whose rails it uses for a few miles and whose terminal facilities it contracts for, is no more reasonable than it would be to treat a stage-coach as belonging to the turnpike companies to which it pays toll for the use of their highways. When, in former days, the Albany and the Boston stage-coaches traveled over the same highway from the Battery to the northern part of Manhattan Island, it would certainly have been thought unjust to maintain that the one mail-carrier was to be paid for the transportation of mails by the other because only one postal route over a postal road could be recognized by the department.
As between a railway company and the public, its service begins with its starting-point, whether on its own or a hired track. The service is as completely its own upon the hired track as upon its own proper rails, and it is a matter of indifference whether the right to use the rail comes from ownership, or from a lease of the road-bed, or by virtue of hiring an easement over the track.
The application of these principles to the case of the Philadelphia and Baltimore Central Railroad Company is not difficult. On the 1st July, 1873, that company, which before then had been carrying mails -without an agent between Chester and Port Deposit in the ordinary way, placed at Philadelphia, at the request of the Postmaster-General, postal-car accommodations for the exclusive use of the mails between Philadelphia and Port Deposit and of the mail-agent who was to accompany them. That car was put into a train of the Philadelphia and Baltimore Central Company, and that train was hauled from Philadelphia to Port Deposit. A similar service was rendered on the same day from Port Deposit to Philadelphia, and these sendees were continued till March 8, 1877. Although it is not found as a fact (because not proved) who hauled between Chester and Philadelphia the cars and trains of the Baltimore Central Company, we are satisfied that such service was performed at the expense of that company.
*207 On these facts it is clear that the Postmaster-Ceneral established a railroad post-route, in the government sense of the term, between Philadelphia and Port Deposit; that he requested the Philadelphia and Baltimore Central Railroad Company to carry the mails over that route with the improved accommodations and facilities contemplated b3r the Act of 1873; and that the company complied in every respect with the request of the Postmaster-General. Thereby it became entitled to be compensated for that service according to the provisions of the statute.
The statute fixes a scale of prices and weights, and provides that the pay for the service is not to exceed those rates. It has not been necessary for us to consider what would be a reasonable rate in the present case, since it is admitted by the parties in the “agreed facts” that in case the route between Philadelphia and Port Deposit is to be regarded as an independent route, the compensation should be at the rate of $82 per mile per annum. The company has been paid at this rate for the transportation between Port Deposit and Chester. As between Chester and Philadelphia, it has already received through the Philadelphia, "Wilmington and Baltimore Railroad Company pay for the whole period at the rate of $8 per mile. It took no exception to this rate of payment until December 4,1875. Up to that time, therefore, it must be regarded as acquiescing in the department’s ruling. After that date it was entitled to receive pay at the rate of $82 per mile for the distance between Philadelphia and Chester. Having been already paid $8 per mile, it is consequently entitled to recover in this action at the rate of $74 per mile per annum for mail-transportation 14 miles from December 4,1875, to March 7, 1877, inclusive.
The Philadelphia, Wilmington and Baltimore Company’s claim presents some different features. There the same company operated the branch road and the main line, and we are asked to decide that the same railroad company can operate two postal routes over the same track. On careful consideration we see no objection to this conclusion, provided the routes are separate and the service distinct. They are so in this case. Before July 1,1873, the company was serving the Delmar line'from its main line by transporting mails over the latter line to Wilmington and there delivering them to the branch. On that day, at the request of the Postmaster-General, it changed this service, and gave the Government postal cars, with accommodations for route- *208 agents, and it ran them on separate Delmar trains both ways between Philadelphia and Delmar. As in the former case, so here, the Postmaster-General established a new postal route, and the company carried the mails oh that route in the manner prescribed by that officer, and thereby it earned the right to be paid accordingly. It has been paid in full for the transportation between Wilmington and Delmar, and in part for the transportation between Wilmington and Philadelphia. Until May 15, 1874, it acquiesced in the ruling under which the part payment was made as a payment in full. It can, therefore, only recover in this action for transportation between Wilmington and Philadelphia after May 15,1874, and for that only the difference between the rates which it is agreed by the parties would have been paid had the route been regarded as a separate route and the amounts already paid for such transportation. The parties agree that between May 15,1874, and June 30,1874, had the service between Philadelphia and Delmar been regarded as an independent service, the pay would have been at the rate of $2,940 per annum, while the sum actually received was at the rate of $364 per annum; that between July 1,1874, and June 30,1876, the pay for an independent service would have amounted, to $8,232, while the sum actually received was at the rate of $24 per mile per annum for the 28 miles, amounting to $1,344; and that from June 30, 1876, to March 7,1877, both rates were 10 per cent, less than during the previous two years.
The judgments of the court are that the claimant, the Philadelphia and Baltimore Central Railroad Company, recover of the defendants the sum of $1,299.94; and that the claimant, the Philadelphia, Wilmington and Baltimore Railroad Company, recover of the defendants the sum of $9,250.12.