Peelle, Ch. J.,
delivered the opinion of the court:
The claimant herein, a corporation, organized under the laws of the State of Oregon, owned and operated during the rendition of'the services herein claimed for, and still owns and operates, a line of railroad between Astoria and Goble, with several branches, all in said State of Oregon. From Goble to Portland, in said State, a distance of 39.40 miles, the claimant, during the same period, under the contract of lease therefor with the Northern Pacific Eailway Company (successor to the Northern Pacific Eailroad Company), operated and still operates its trains over the track of said Northern Pacific Eailway Company, a road aided in its construction with lands of the United States, granted under the provisions of the act of July 2, 1804 (13 Stat. L., 365). ■The action is to recover the full tariff rates for transporting-military supplies over the land-aided portion of said road.
The reason stated for the contract between the two companies, as set forth in the preamble thereto, was that the claimant company had obtained authority to construct and operate a railroad between Astoria and Portland, in the *299 State of Oregon, which line was then being constructed from Astoria to Goble, and, if constructed from Goble to Portland, would parallel the line of said Pacific Company; that it would be to the mutual advantage of both companies for the Astoria Company to connect at Goble with and operate its trains over the line of the Northern Pacific Company ; hence the contract.
By Article II it was provided:
“ The Astoria Company shall have the right to use said connection and the main tracks, switches, side tracks, water tanks, turntables, stations,' grounds, and all the railway property and appurtenances of .the Pacific Company between said connection and the connection of the Northern Pacific tracks and the tracks of the Northern Pacific Terminal Company, at or near Wilson street, in Portland — that is, between the points marked ‘A5 and 1 B ’ on the map hereto attached — for the purpose of running its own trains and locomotives run by its own employees over the same, but excepting from the tracks which the Astoria Company has the right to use the inclined tracks at Goble leading to the transfer and railroad ferry of the Pacific Company.”
Then, after reciting the valuation of the property as the basis of rental to be paid by the claimant company, including a proportionate share of the salaries of station agents, it is provided by Article V as follows:
“ The use of said railway and other property by the Astoria Company shall be in common with the Pacific Company and such other parties as it has admitted, of may admit to the use thereof; and the use thereof and movement of trains over the same shall be under time cards, rules, and regulations of the Pacific Company, to be made and changed from time to time by its proper officers, but the same shall be just and reasonable, without discrimination between the parties. The rights herein granted to the Astoria Company shall be used solely for its own business, and nothing herein shall authorize the Astoria Company, under cover hereof, or otherwise, to use, or permit any other railway company or line of railway to have the benefit of using, for the business of such other company or line, any of the rights hereby granted.” .
Then, after stating the risk each company assumes in the operation of its trains for injury to persons and property and the annulment of the contract at the option of the Pacific *300 Company on the failure of the claimant company to pay the rent agreed upon, it is provided by Article VIII as follows:
“ The Astoria Company shall have no right to carry any passengers or freight or transact any business locally between Goble and Portland, inclusive, and intervening stations ; but it shall have a right, in addition to through business, to transport passengers and freight between Goble, Portland, and intervening stations and stations on its own line. If the Astoria Company shall, however, be compelled by law to transact any local business forbidden to it by the provisions of this article, it shall account to and pay over to the Pacific Company on demand the whole gross revenue received therefrom.”
The further provisions of the contract refer to the method of adjusting disputes between the companies, and the contact concludes with Article XIII, as follows:
“ This agreement shall go into effect on the 1st day of June, 1898, or at such earlier date as may be fixed by the Astoria Company, and after the agreement takes effect it shall be in force ninety-nine years from that date.”
Pursuant to the act of July 2, 1864, sufra, the road for which the lands were granted, including that portion of the road from Goble to Portland, was constructed. The grant was accepted, and the road was constructed on the conditions, among others, set forth in section 11 of the act, which reads as follows:
“ Sec. 11. And be it further enacted,, That said Northern Pacific Eailroad, or any part thereof, shall be a post route and a military road, subject to the use of the United States, for postal, military, naval, and all other Government service, and also subject to such regulations as Congress may impose restricting the charges for such Government transportation.”
Stronger language than that could not have been employed to establish a post route and military road subject to the use of the Government for the purposes therein stated. The railroad thus established as a post route and military road was, in unmistakable terms, made subject to such regulations restricting the charges for transportation thereon as Congress might impose, and was clearly intended to apply to any carrier regularly operating trains over said railroad or any part thereof.
*301 In conformity with that section the act of February 27, 1893 (27 Stat. L., 483), making appropriations for the support of the Army, contained the following proviso:
“Provided further, That in expending the money appropriated-by this act, a railroad company which has not received aid in bonds of the United States, and which obtained a grant of public land to aid in the construction of its railroad on condition that such railroad should be a post route and military road subject to the use of the United States for postal, military, naval, and other Government services, and also subject to such regulations as Congress may impose restricting the charge for such Government transportation, having claims against the United States for transportation of troops and munitions of war and military supplies and property over such aided railroad, shall be paid out of the moneys appropriated by the foregoing provision only on the basis of such rate for the transportation of such troops and munitions of Avar and military supplies and property as the Secretary of War shall deem just and reasonable under the foregoing provision, such rate not to exceed fifty per centum of the compensation for such Government transportation as shall at the time be charged to and paid by private parties to any such company for like and similar transportation; and the amount so fixed to be paid shall be accepted as in full for all demands for such service.”
Similar provisions have been inserted in like appropriation acts from year to year ever since, including 31 Stat. L., 907; 32 Stat. L., 517 and 938; 33 Stat. L., 270 and 837.
There is no controversy but that the statutory regulation limiting the charges for the transportation of troops and military supplies over said road applies to the Northern Pacific Railway Company, but the contention of the claimant is that, although under the contract aforesaid the claimant’s use of the road betiveen Goble and Portland Avas, arid is, “ in common with the Pacific Company and such other parties as it has admitted or may admit to the use thereof,” still, as the Northern Pacific Company has, by the terms of the contract, reserved to itself the local business between those stations, it has not thereby lessened its power to serve the Government in the transportation of troops and such military supplies as may be required of it.
In other words, the contention is that while the Northern Pacific Company is subject to such regulations limiting *302 charges for the transportation of troops and military supplies for the Government, it may, by leasing a portion of its railroad to another carrier over ivhich to operate its trains for a period of ninety-nine years thereby exempt such lessee from the conditions imposed on the lessor by section 11 of the granting act.
If this be true, then it follows that .the Northern Pacific Company may lease different portions of its railroad, branches, and appurtenances thereto, to as many different carriers (willing to connect with its line), and thereby practically defeat the conditions imposed respecting the rates fixed for Government transportation; or it might lease its entire road, rolling stock, and equipment, reserving to itself the right only to transport Government troops and supplies.
In such case it would not be enough to say that because the Northern Pacific Company has reserved to itself the local business along such leased portions of its railroad, or the right to perform the Government sendee, therefore it has not disabled itself from complying with the conditions imposed upon it. Its obligation to the public is imposed in the main by public policy, while its duty to the Government is regulated as well by the statute which created and aided it in the construction of the railroad; and its successors, assigns, and lessees are bound by the conditions imposed by the granting act.
A further answer to the claimant’s contention is that the claimant carried the freight. If the claimant was not subject to the conditions of the grant, it was not obligated to carry such freight, but having carried the freight over the land-grant road, it did so subject to the conditions of the grant, which neither the claimant nor the Government officers could change.
The Northern Pacific Eailroad Company, the lessor or predecessor of the Northern Pacific Eailway Company, ivas a corporation created by the act granting the land for the construction of its railroad or roadway, and was subject to the conditions prescribed in the act, among which ivas that the “ railroad, or any part thereof, shall be a post route and military road, subject to the use of the United States ” for *303 Government service at such rates or charges as Congress may impose. And Congress, by the provisions in the appropriation acts referred to, have exercised their right to fix the maximum charges for the transportation of troops and military supplies over said road at 50 per cent of the rates charged to and paid by private parties for like transportation for such service.
The right to the use of the railroad by the Government as a post route and military road is a right annexed to and forms a part of the grant, in the nature of a covenant running with the land — the" roadway — and that right can not be waived or separated from the railroad without the consent of Congress by appropriate legislation.
Grants of land by Congress for the construction of railroads are not only conveyances, but are laws, subject to the same rules of construction as other legislative acts. (Missouri Pacific R. R. Co. v. Kansas Pacific R. R. Co., 97 U. S., 491, and Barney v. Winona R. R. Co., 117 U. S., 228.)
The grant by the act of July 2, 1864, to the Northern Pacific Railroad Company of the right of way through the public lands and to every alternate odd-numbered section of such lands on either side of the line of said railroad, within the limits therein prescribed, was to aid in the construction of said railroad “ to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railroad ” to the Pacific coast at such rates as Congress might impose.
It does not appear to have been in the mind of Congress, and certainly was never expressed in legislation, that the Government was to engage in the business of owning and operating trains and rolling stock with which to transport over said railroad its troops and supplies. If it had been, there would have been no necessity for the provision in section 11 making such service subject to the regulations of Congress restricting the charges therefor.
As the right to the use of the railroad by the Government for such transportation is reserved by- Congress, it is manifest that the regulations restricting charges therefor must apply to any carrier transporting troops and supplies for the *304 Government over said railroad. Otherwise the regulations Avould be inoperative.
When the Northern Pacific Company leases a portion of its roadway, as in the present case, such lease, it must be held in the absence of any waiver by. Congress, is taken subject to the conditions of the grant imposed upon the lessor. This would certainly not be controverted if the lease extended to the whole line of the land-aided railroad. In such case it would seem to require no argument or citation of authorities to show that the lessee would-take not only subject to all the provisions and limitations of the granting act, but to the laws enacted thereunder applicable to the lessor as. well; that .is to say, in case the Northern Pacific Company should lease all of its right, title, and interest in and to said railroad, the granting act, with all its provisions aiicl limitations, would as a matter of law be incorporated in such lease, and the lessee would be bound thereby, as was the Northern Pacific Railway Company, successor to the Northern Pacific Railroad Company. (See Union Pacific Railroad Co. v. Mason City and Fort Dodge Railroad Co., 199 U. S., 160.)
This being true, by whom and ivhere shall the line be drawn exempting the lessee from the performance of Government service at the rate prescribed for transportation over said railroad? The Government, like any other shipper, is entitled to select its own carrier, and in case .of connecting lines it has the right to direct the particular route over which its troops and supplies shall be shipped. In accepting the lease, as well as in the performance of the service for the Government, the claimant was bound to know that the railroad, owned and operated by the Northern Pacific Railway Company between Goble and Portland was a land-aided railroad, subject to the use of the Government as a post route and military road, at the rates for transportation theretofore established by Congress.
The claimant in the main bases its contention on the cases of the Lake Superior and Mississippi River Railraod Co. v. The United States (93 U. S., 442); The Union Pacific Railway Co. v. Chicago Railway Co. (163 U. S., 564); and the Railway Mail cases (13 C. Cls. R., 199),
*305 The first of the cases cited arose under the act of May 5, 1866 (13 Stat. L., 64), making a grant of public lands to the State of Minnesota to aid in the construction of a railroad. By section 5 of the act respecting the road to be constructed it was provided:
“ That said railroad shall be and remain a public highway for the use of the Government of the United States, free from all toll or other charge, for the transportation of any property or troops of the United States.”
By section 7 of the same act it ivas provided:
“ That the United States mail shall be transported over said road, under the direction of the Post-Office Department, at such price as Congress may by law direct: -Provided, That until such price is fixed by law the Postmaster-General shall have the power to determine the same.”
In respect to section 5, first above quoted, being the only one involved in that action (the court saying “the case turns upon the construction that should be given ” thereto), it was held by a divided court.that while the provision secured to the Government the use of the road for the transportation of its troops and supplies free from all toll or other charges it did not carry with it the right to the free service of the carrier operating such road. That is to say, while by the statute the Government ivas entitled to the use of the roadway and all fixtures and appurtenances forming a part of the road free from toll or other charge for such transportation, the carrier performing such service was -entitled to be paid therefor by the Government the regular rates for such service, less certain deductions for the use of the roadway.
It will be observed that the statute construed in that case is quite different from the one in the present case. Here the statute expressly provides that the railroad so constructed shall not only be a post route and a military road subject to the use of the Government, but shall be subject to such regulations as Congress may impose .restricting the charges therefor; and such regulations restricting charges would certainly apply to the carrier or company owning- or operating its trains and rolling stock over- and in connection *306 with the roadway and not to the roadway independent oí such carrier.
In comparing the conditions in the granting act in that case with those in other acts .Requiring the transportation of mails, troops,.and supplies by companies owning or operating the railroads so constructed the court said:
“ It is not without significance, in this connection, that in other grants, ivhen Congress intended to provide for transportation being performed by the railroad company, explicit and proper language is used for that purpose. As in the case of the Union Pacific Eailroad Company, chartered by Congress July 1,1862, where it is enacted -that the company shall transmit disjiatches over its telegraph lines, transport mails, troops, and munitions of war, supplies, and public stores, upon its railroad for the Government whenever required to do so by any Department thereof, and that the Government shall at all times have the preference in the use of the same for all the purposes aforesaid, at fair and reasonable rates of compensation, not to exceed the amount paid by private parties for the same kind of service. (12 Stat., 493.) In this case compensation ivas provided for. In other cases the transportation was to be furnished without charge. After the discussion in 1865, before referred to, Congress made several grants of land, with the express reservation that the Government property should be transjiorted over the roads concerned at the cost, charge, and expense of the company owning and operating the same, when required by the United States so to do, using language entirely different from that under consideration in the cases now before the court. See acts of 1866 (14 Stat., 95, 237, 241, 290, 338, 549).”
In some of the acts cited above the grants are on condition that the troops aild military supplies of the United States shall be transported over the road so constructed “ at the cost, charge, and expense of the corporations or companies owning or operating the same when so required by the Government ” (pp. 95, 214, 338), while the other acts referred to provide tha' such transportation shall be without cost to the Government when required by the. Government or any Department thereof (pp. 290, 338, 549).
It will thus be observed that the conditions imposed by the several acts referred to by the court are, in substance, the same respecting the transportation of troops and military *307 supplies over said roads by the corporations owning or operating the same free of cost to the Government.
In response to the contention of the Government in that case that the term “ railroad- ” should include the equipment of the road and the free use of the locomotives and cars of the 'company as well as the track, the court said: ,
“ No doubt the word, as used in certain connections and in particular charters and instruments, may properly have a wider latitude of signification, so as to include the equipment and rolling stock as accessory to the track, constituting together one incorporated mass or corpus of property as the subject-matter of the particular enactment or disposition. It is not our purpose to question the propriety of this view in the cases and for the purposes to which it may be applicable. But where, as in the laws under review, the railroad is referred to throughout in its character as a road, as a permanent structure, and designated and required to be a ‘ public highway,’ it can not, without doing violence to language and disregarding the long-established usage of legislative expression, as shown in the previous part of this opinion, be extended to embrace the rolling stock or other personal property of the railroad company.”
It can hardly be doubted that if the provisions of section 7 in the granting act in that case had been under consideration a different result would have been reached, for that section provides—
“ that the United States mail shall be transported over said road, under the direction of the Post-Office Department, at such price as Congress may by law direct: Provided, That • until such price is fixed by law the Postmaster-General shall have the power to determine the same.”
Before that decision was rendered Congress, by the act of July 12, 1876 (19 Stat. L.., 78, 82), making appropriations for the service of the Post-Office Department, by section 13 thereof provided: “ That railroad companies whose railroad was constructed in whole or in. part by a land grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct shall receive only 80 per centum of the compensation authorized by this act.”
It would hardly be contended that the language there used would not apply to the assignee or lessee of a company whose *308 railroad had been constructed in whole or in part by a land grant made by Congress; and if not, then such company, its assigns, 'or lessees could be required to transport the mail under the direction of the Post-Office Department at the price Congress there fixed.
In the present case both classes of transportation are included in the same section, i. e., postal and military, as well as all other Government sendee, and all such service is made “ subject to such regulations as Congress may impose restricting the charges ” therefor.
In the case of the Union Pacific Railway Company v. Chicago, etc., Railway (supra), the question involved was as to the right of the Union Pacific Company to enter into contracts with other companies for running arrangements, including the use of its tracks, and it was held by a divided court that such contracts were within the powers of the Union Pacific Company, and that in making such contracts it parted with no franchise and had not disabled itself from discharging its duty to the jiublic, the court among other things saying:
“ What it agreed to do was to let the Eock Island enjoy such use of the bridge and track as it did not need for its own purposes. This did not alien any property or right necessary to- the discharge of its public obligations and duties, but simply widened the extent of the use of its property for the same purposes for which that property was acquired, to its own profit, so far as that use was concerned, and in furtherance of the demands of a wise public policy.”
In the present case the right of the Northern Pacific Company to contract Avith the claimant company for the use of its road between Goble and Portland is not controverted. And, to apply Avhat is said in the case last cited to the present case, the Northern Pacific Company, by it? contract Avith the claimant company, “ Avidened the extent of the hse of its property for the same purposes for Avhich that property was acquired,” i. e., “ to its OAvn profit, so far as that use Avas concerned, and in furtherance of the demands of a Avise public policy.” Certainly, “ the demands of a wise public policy ” require that Avlien the Government desires *309 to ship troops or supplies by the claimant company from Fort Stevens or from xlstoria to. Portland by the way of Goble it shall have the right to do so at such rates over the land-aided portion of said road as the Congress may prescribe, without being compelled to reship or transfer such property at Goble to the Northern Pacific Company.
In The Railway Mail Service eases (13 C. Cls. R., 199) the question was, whether the railroad company carrying mails over the track of another company by means of its own engines, cars, servants, etc., was entitled, in its dealings with the Post-Office Department, to have such hired track considered as part of its own road when another company was at the same time performing mail service on' the same track. The court held that it was, among other- things saying: “As between a railway company and the public, its service begins with its starting point, whether on its own or hired track. The service is as completely its own upon the hired track as upon its own proper rails, and it is a matter of indifference whether the right to use the rail comes from ownership, or from a lease of the roadbed, or by virtue of hiring an easement over the track.'” And so in the present case, it is a matter of indifference to the Government, whether the road it has aided to construct is operated by the company to whom the lands were granted, or by its assigns or lessees, the Government is entitled in either case to the transportation of its troops and supplies over such road at the rates prescribed by Congress.
But the claimant contends that the subject-matter here involved passed to final judgment before a court of competent jurisdiction without fraud or collusion, and therefore the question is res judicata. In support of that contention the claimant relies upon the proceedings in the circuit court of the .United States for the district of Oregon, wherein a bill in equity for an injunction ivas filed on behalf of the United States by the district attorney for that district against the claimant herein as defendant. (131 Fed. Rep., 1006.)
An examination of the bill in the certified transcript before us shows that the suit was for an injunction based on the alleged refusal of the Astoria and Columbia River Railroad Company to receive and transport supplies for the Gov- *310 eminent over said road between Portland and Goble, and particularly a box of Government supplies delivered to said company at Portland January 25, 1904, for shipment from Portland to Fort Stevens via Goble and Astoria, at the rates prescribed by Congress for Government service over the land-aided portion of said road. To the bill thus filed said company filed its answer, denying that it had at any time refused or that it still refuses to receive or that it would refuse to receive and transport Government supplies between Portland and Goble because of the reduced rates prescribed therefor by Congress, but admitted that it had refused and still refuses to receive and transport such supplies for the Government or anyone else between those points on the ground that its contract with the Northern Pacific Railway Company would not permit it to do so; that no tariff rate had been established by it between Portland and Goble, but that its rate from Portland via Goble to Astoria, or from Goble to Astoria or Fort Stevens, was 25 cents per hundred pounds, and at that rate it would have received and transported the box of Government freight referred to; but the officers and agents of the United States refused to pay said rate.
The refusal of said company to receive and transport the box of Government supplies, it will be observed, was because of the lease contract aforesaid between it and the Northern Pacific Railroad Company; that its rate from Portland to Astoria and Fort Stevens by way of Goble was the same as from Goble to Astoria and Fort Stevens, and hence no charge was included therein for transportation between Portland and Goble. The bill was based on the refusal of the company to transport Government supplies between Portland and Goble at the rates prescribed by Congress, and on that ground an injunction was sought restraining1 said company from so doing. But as said company, by its answer under oath, denied that it had refused to receive and transport freight over its road from Portland to Goble because of such reduced rate or because of any other rate or cause other than its contract with the Northern Pacific Railroad Company, the bill was dismissed on the ground that it appeared to the court that the equities were with the defendants.
*311 From the order dismissing the bill no appeal was taken, but aside from the question as to whether, in such case, an appeal would lie, the Government refused to acquiesce in the decision and still refuses to abide thereby. The decision of the court, so far as the transcript before us discloses, was based on the bill and answer. The merits of the controversy were not gone into further than to determine whether the injunction would lie.
"We must hold that for the reasons given the claimant is not entitled to recover for the transportation of troops and siipplies over the tracks of the Northern Pacific Railway Company between Portland and Goble in excess of the rates prescribed therefor by Congress, and in that respect its petition is dismissed.
For any amount otherwise due for such transportation judgment will be suspended until the amount due has been ascertained. When, on motion therefor, judgment will be entered.