## POWELL et al. v. UNITED STATES.
### Civil Action No. 321.

District Court, E. D. Virginia.
March 24, 1945.

W. R. C. Cocke, Thomas L. Preston, and F. S. Sargeant, all of Norfolk, Va., for plaintiffs.

Francis M. Shea, Asst. Atty. Gen., Harry H. Holt, Jr., U. S. Atty., of Hampton, Va., Walkley E. Johnson, Asst. U. S. Atty., of Belle Haven, Va., Arnold Levy, Sp. Asst. to Atty. Gen., and Hubert Margolies, Frederick Chait, Irvin M. Gottlieb, and Irving Brand, all of Washington, D. C., for the United States.

HUTCHESON, District Judge.

This is a suit brought under Paragraph 20 of Section 24 of the Judicial Code of March 3, 1911, 36 Stat. 1093, as amended, 28 U.S.C.A. § 41(20), known as the Tucker Act.

The parties have entered into statements of agreed facts, respectively denominated "Stipulation of Facts" and "Supplemental Stipulation of Facts", with certain exhibits attached thereto.

The claim sued upon is for unpaid transportation charges in the amount of $637.54, in respect of which the stipulation of facts reads as follows:

"During July, 1942, the Seaboard rendered its bill (PD–7–23) against the United States in the sum of $733.79 for freight charges on six carloads of wood pulp which had been transported by the Seaboard from Savannah, Georgia, to Norfolk, Virginia. The United States did not question the correctness of said charges, but deducted from the amount due the sum of $637.54, and on September 14, 1942, paid to the Seaboard the balance of $96.25. The sum of $96.25 was accepted by the Seaboard, but under protest and as part payment only. The Seaboard instituted this action to recover the balance due on said bill, to-wit, the sum of $637.54, and the United States has filed herein its counterclaim for the deduction made from said bill."

The pertinent facts as to the counterclaim asserted by the United States, as shown by the stipulation of facts, are as follows:

During August, 1941, fifty-six (56) carloads of phosphate rock, property of the United States, were transported over the Seaboard from Brewster, Florida, to Tampa, Florida, consigned to the British Ministry of War Transport, an agency representative in the United States of His Majesty's Government in the United Kingdom. The shipment moved for export, and was exported, to England under the Lend-Lease Program, Act of March 11, 1941, Public No. 11, 55 Stat. 31, 22 U.S.C.A. § 411 et seq., and Act of March 27, 1941, Public No. 23, 55 Stat. 53. In due course, upon bill rendered, the United States paid to the Seaboard for transportation of this shipment the sum of $2,608.70.

During the same month several shipments aggregating twenty-two (22) carloads of superphosphate, property of the United States, were transported over the

Seaboard from Nichols, Florida, to Tampa, Florida, likewise consigned to the British Ministry of War Transport. These shipments also moved for export, and were exported, to England under the Lend-Lease Program. Upon bill rendered, the United States paid to the Seaboard for transportation of these shipments the sum of $546.17. On all shipments the Seaboard's charge was computed at full commercial tariff rates for like services to the general public.

In August, 1942, upon post audit, the United States notified the Seaboard that it took exception to the bills for $2,608.70 and $546.17, both of which it had already. paid in full. It was claimed that the bills in question included overcharges in the respective amounts of $472.81 and $164.73, or a total overcharge of $637.54. Accordingly, this amount was deducted from the unpaid bill for $733.79 covering the shipment of wood pulp above mentioned, and the balance of $96.25 only was paid.

The exception taken by the United States to the bills rendered by the Seaboard for transportation of the phosphate rock and superphosphate shipments above described, was based upon the contention that these shipments constituted "military or naval property of the United States moving for military or naval and not for civil use", within the meaning of Section 321(a) of the Transportation Act of 1940, 49 U.S.C.A. § 65(a).[1] If this contention be sound, the shipments were entitled to move subject to so-called "land grant" deductions from the full commercial rates, as hereinafter explained. It is not disputed that the deduction made was accurately computed. But, as set forth in petitioners' Reply to Counterclaim, "petitioners deny that said phosphate rock and superphosphate were military or naval property of· the United States moving for military or naval and not for civil use, and entitled to land-grant deductions".

No controversy exists as to the validity of the claim sued upon independently of the foregoing counterclaim set up by way of defense. If the counterclaim asserted is valid, the suit should be dismissed, and if not valid, judgment should be rendered the plaintiffs in accordance with the prayer of the petition. This is agreed upon between the parties and so appears from the stipulation.

Reduced to simple terms, the question is whether the phosphate rock and superphosphate constituting the shipments involved constituted "military or naval property of the United States moving for military or naval and not for civil use" within the meaning of the Transportation Act of 1940.

The contentions of the respective parties have been ably presented by both oral argument and briefs.

In approaching the subject it is helpful to give some consideration to the history of both the Transportation Act and the Lend-Lease Act.

During the early years of expanding railroad development the United States granted public lands to numerous railroads, particularly in the West and to many in the South. The underlying policy of the Government was to encourage the building of railroads in unsettled or sparsely settled areas to facilitate the development of such areas and to ultimately afford additional markets and sources of produce to the more congested sections of the country and to provide a means of transporting troops and military equipment in time of need. Among the roads to which such grants were made were certain corporations which were predecessors in title of the Seaboard (the plaintiff here). This result in respect of the Seaboard was accomplished through grants directly to the State of Florida and by that State in turn to such corporations. The original grant was made for the construction of a main line of railroad from Fernandina to Tampa Bay and a branch line from Waldo to Cedar Key and contained the following condition:

"And the said railroad * * * shall be and remain a public highway for the use of the government of the United States, free from toll or other charges upon the transportation of any property or troops of the United States." Act of May 17, 1856, Section 3, 11 Stat. 15.

---

[1] "Sec. 321(a). Notwithstanding any other provision of law, * * * the full applicable commercial rates * * * shall be paid for transportation by any common carrier subject to the Act of any * * * property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use or to the transportation of members of the military or naval forces of the United States * * * when such members are travelling on official duty; * * * ."

Similar conditions were imposed by the terms of other grants.

In Lake Superior & M. R. Co. v. United States, 93 U.S. 442, 23 L.Ed. 965, decided in 1877, the Supreme Court construed the condition of such grant as reserving to the Government only the free use of the road bed as a highway but held that the railroad could not be required to transport over such road troops or property of the Government free of charge.

Following the foregoing decision the Court of Claims held, that by reason of the right of the Government as provided in the reservation to· use the road bed, a reduction of fifty per cent in rates should be allowed by the railroad in transporting such property. Thus the Government bore 50% of the total burden of such tranportation in the form of its right to use the road bed and the railroad was paid the remaining 50% as compensation for the use and operation of its equipment.[2]

In 1924 an act was passed by Congress vesting in the Secretary of War authority to fix such rates for the transportation of property or troops of the United States over land grant roads as he deemed just and reasonable, but not exceeding 50% of the full amount of compensation for like transportation performed for the public at large. Act of June 7, 1924, c. 291, Title I, 43 Stat. 486, 10 U.S.C.A. § 1375. By virtue of the decisions cited and the Act of 1924, the railroads transported over those portions of their respective lines constituting the "land grant" portions, all property of the United States, as well as troops without limitation as to the nature of the property.

Attention is directed to the fact that the Secretary of War was the official designated under that Act to fix the rates. Such designation was probably due to the recognition by Congress of the fact that the bulk of railroad traffic in which the Government was interested was military property.

Being desirous of participating in the traffic, competing lines not subject to the so-called "land grant rates" entered into what has been designated as "equalization agreements" to meet the rates of the "land grant" roads. With such agreements the case at bar is not concerned except as suggesting the far reaching effects on the rate structure of the roads as applied to Government traffic.

Expanding governmental activities during the period following the passage of the Act of 1924 caused an unprecedented increase in the movement over these railroads of vast quantities of property of the United States and a corresponding increase in the travel of civilian employees charged .with the administration of these activities. All such traffic was entitled to move at 50% of the regular commercial rates. This traffic was excluded from the benefits of the reduced rates by the Transportation Act of 1940, enacted pursuant to recommendations of Committees appointed by the President and by the War Department.[3]

In its brief the Government suggests that in enacting the Transportation Act of 1940 Congress had in mind the probable involvement of this Country in war in the near future, and it is contended that the words "military or naval property of the United States moving for military or naval and not for civil use" must be interpreted in the light of conditions then existing.[4]

In March 1941, after eighteen months of hostilities in Europe and with German and Italian conquests expanding, Congress enacted legislation designed to "further * * promote the defense of the United States,

---

[2] Atchison, T. & S. F. R. R. Co. v. United States, 15 Ct.Cl. 126.

[3] See House Document No. 583 of the 75th Congress, 3rd Session; Hearings, 76th Congress, House Committee on Interstate and Foreign Commerce, H.R. 2531, Vol. I, pp. 259–308, at pages 271, 272; Report of Hearings House Committee on Interstate and Foreign Commerce, 75th Congress, pp. 16, 17.

[4] In reconstructing the scene, passing reference may be made to some of the more important related legislative enactments of the period, with the respective dates. Alien Registration Act, 1940, 54 Stat. 673, June 28, 1940; Army Reserve and Retired Personnel Service Law of 1940, 54 Stat. 858, August 27, 1940, 50 U.S.C.A. Appendix § 401 et seq.; Selective Training and Service Act of 1940, 54 Stat. 885, Sept. 16, 1940, 50 U.S.C.A. Appendix § 301 et seq.; Alien Veterans' Act, 54 Stat. 1149, Oct. 14, 1940, 8 U.S. C.A. § 723 et seq.; Soldiers and Sailors Civil Relief Act of 1940, 54 Stat. 1178, Oct. 17, 1940, ·50 U.S.C.A. Appendix § 501 et seq. The Alien Agency Act, 52 Stat. 631, had been amended on August 7, 1939, 53 Stat. 1244, 22 U.S.C.A. § 611 et seq. The Neutrality Acts were the subject of Congressional action in 1940. Other references to contemporary occurrences might be made.

and for other purposes", known as the Lend-Lease Act. Public Law 11, 77th Congress, Chapter 11, First Session, H.R. 1776, 22 U.S.C.A. § 411 et seq. At that time England stood alone and concern regarding a realization of a Japanese threat to the United States mounted.

The Act confers upon the President almost unlimited discretionary powers and among others (Section 3) "to manufacture * * * or otherwise procure * * * any defense article for the government of any country whose defense the President deems vital to the defense of the United States", and "To sell, transfer title to, exchange, lease, lend, or otherwise dispose of, to any such government any defense article * * * after consultation with the Chief of Staff of the Army or the Chief of Naval Operations of the Navy, or both. * * *" And "* * * to release for export any defense article disposed of in any way * * * to any such government." The term "defense article" is defined as meaning, among other things, "any agricultural, industrial or other commodity or article for defense". The term is further defined as including any article manufactured or procured pursuant to Section 3 or to which the United States or any foreign government had or thereafter acquired title, possession or control. Provision is made that the President shall transmit to Congress reports of operations under the Act.

This legislation has been supplemented from time to time by various acts appropriating necessary funds and as of September 25, 1944, seventeen reports of such operations had been submitted to Congress.

It is stipulated that the property involved in the instant case was being transported for the United States; that the property constituted "defense articles", as defined in the Lend-Lease Act; that when requisition is made by any country the defense of which the President deems vital to the defense of the United States, such requisition is carefully considered and scrutinized and is issued, modified or rejected in accordance with the determination by the President or his properly authorized representative as to whether or not such shipment will promote the defense of the United States in accordance with the provisions of the Act. It is further stipulated that either party may refer to the official published reports made to Congress by the President as provided in the Act and to

Rules of the Comptroller General without the formal introduction of such Reports and Rules.

To reach a determination of this case the Court must determine whether under the Transportation Act of 1940 the phosphate rock and superphosphate was, first, military or naval property of the United States, and second, moving for military or naval and not for civil use. Both queries require an affirmance in order to sustain the Government's position.

■ The second question does not involve a consideration of the nation by which the property might be put to military or naval use. Such use of the property by a power other than the United States would seem to be such military or naval use as would be sufficient for the requirement of the Act.

While phosphate rock and superphosphate may be used for various purposes, it is stipulated that the shipment here involved was destined for use as agricultural fertilizer supplied the farmer in Great Britain under the Lend-Lease Act and was moving over a land-grant railroad. The stipulation contains the following language:

"In 1941, at the times the requisitions for the materials involved in the counterclaim were made, approved and authorized, and the shipments moved, there was a serious food situation in Great Britain, by virtue of the fact that Great Britain, normally a heavy food importing nation, was cut off from many sources of supply. Imports were further restricted by shortage of shipping. Great Britain therefore found it necessary to revise her agricultural practices in order to intensify production of food for direct human consumption. It was necessary to put into production a large acreage of land normally not used for the production of food for direct human consumption, and phosphate fertilizers had to be imported and distributed to effectuate this revised agricultural program. The shipments of phosphate rock and superphosphate comprised a part of that program. Great Britain instituted controls which resulted in the proper use and distribution of said materials to accomplish this purpose, for which they were requisitioned and authorized under the Lend-Lease Act."

■ The Lend-Lease Act contains no language indicating an intention on the

part of Congress to modify the terms of the Transportation Act nor does it define materials acquired thereunder as being intended or destined for military or naval use unless it be considered that the term "defense" as there employed necessarily implies such use. It is urged that in waging modern warfare all resources of a country are mobilized and articles heretofore considered as non-military assume such character in conducting what has been termed "total war". England has been likened to a besieged fortress and it is contended that such assistance as was rendered that country was assistance in carrying on the war in a military sense. The contention of the Government is briefly summed up in the following quotations from its brief:

"In an integrated war economy, the supply of raw materials, the exploitation of the industrial plant, and the utilization of the land for food production are directly related to war. With modern science and changed methods of war transforming many substances once considered unimportant for a belligerent's purposes into strategic military material, the general language 'military property' cannot be limited to the precise items which would have been embraced within it centuries ago."

And further:

"It is not suggested that food stuffs, or phosphate are necessarily 'military property', as such. However, under the particular conditions of war or defense, they can become indispensable to military functioning. When owned by the United States, and devoted to a war or defense use, they take on a character of military property. Military and non-military articles can be classified only after appropriate consideration has been given to the pressures, the exigencies and the practice of the times. Thus, even when food was not considered to be contraband unless moving for direct army use, it was recognized that the proclamation of a warring government could impress it with the character of contraband." Citing Balfour, Guthrie & Co. v. Portland and Asiatic S. S. Co., D.C., 167 F. 1010; Spiegel, Economics of Total War (1942), p. 287.

This line of reasoning, if followed to its logical conclusion, would obliterate any distinction between the civilian and the military in time of war.

In adopting the language of the Transportation Act, Congress recognized a distinction between military or naval property and other property of the Government and it recognized the distinction between military or naval property moving for military or naval use and such property moving for civil use. As has been pointed out, the Act was passed at a time when there existed a threat of involvement of this country in total war on a world-wide stage, the serious nature of which is realized when it is recalled that the threat resulted in an accomplished fact within less than fifteen months from the time Congress acted. The United States along with the world was a close observer of the methods of waging "total war" and Congress was fully aware that modern wars engage the full resources of belligerent nations. Nevertheless, the Act clearly recognizes the distinction between the civil and the military. Appropriate language might have been used basing the exception upon the existence of a state of war, but this was not done.

An examination of the reports made to Congress by the President of the operations under the Lend-Lease Act shows the nature of the property transferred to be almost as various as the property itself and as varied as the nations participating. For example, the report of August 24, 1944, lists 46 foreign countries as participating and the articles distributed embrace, among other things, ordnance and combat ships upon the one hand and dried beans and skimmed milk upon the other. Beginning in December 1941, 1,300,000 small children received a regular supply of concentrated orange or black currant juice and of cod liver oil compound.

While the agencies employed in acquiring these varied articles are not specifically reflected in respect of each item, the Lend-Lease Act and the Defense and Supplemental Appropriation Act provide for authorization by the President in this connection of not only the Secretary of War and the Secretary of the Navy, but the head of any other department or agency of the Government.

In the several reports a distinction is drawn between military and non-military goods. For example, in the report of August 24, 1944, Table No. 3, appearing on page 11, is denominated: "Quantities of Non-Military Goods Transferred", and among other items lists fertilizer—the article with which we are now concerned. Similar instances appear at many places in the various reports and innumerable il-

lustrations of the transfer of articles strictly for use by civilians might be shown.

It would appear that Congress adopted or approved this interpretation. The President has repeatedly reported to Congress tne distribution of huge quantities of non-military and distinctly civilian goods and with these reports before it Congress has endorsed and approved this course by enabling its continuance by the enactment of the necessary appropriation acts.

■ The construction given to a statute by the Executive Department charged with its administration is entitled to great weight.[5]

Fertilizer is an article of value defensively. That fact has been determined by the President and stipulated by the parties and the Court has no authority to review or inquire into such determination. But does the identity of an article as being of value or use in defense of the nation necessarily imply a military or naval and not civil use? It may have a potential military value. Phosphate concededly does have value or use in the manufacture of munitions but that is not the use to which this particular shipment was moving.

Among other definitions, Funk and Wagnalls Standard Dictionary of the English Language defines "defense" as: "To defend; vindicate; fortify * * *", and "defend" as: "To protect or shield from attack or violence; guard against threatened or offered harm; to make a stand for, or uphold by force or argument; maintain against attack, encroachment or opposition; maintain; vindicate, as to defend the course of the administration * * *".

"Military" is defined as: "Of or pertaining to soldiers, arms or warfare * * soldierly, warlike; martial; done, supported, or carried on by force of arms; assigned to or occupied by troops".

"Civilian" is defined as: "One who follows civil pursuits as distinguished from military, naval or clerical".

"Civil" means: "Pertaining to a citizen in regard to ordinary affairs; opposed to ecclesiastical or military".

■ Unless technically employed, language is to be given its ordinary meaning and from the definitions cited it follows that while the term "defense" may and often does carry with it the idea of force, it does not necessarily mean the use of physical force. Upon the contrary it may, and often does, mean the employment of efforts unrelated to physical force. Translated to terms of the individual it may mean the peaceful application to a court of law for protection against a threat to property. On the part of the state it may mean draining a swamp to defend the health of the citizens or the construction of housing projects to provide accommodations for civilians employed in industries producing war materials.

■ Between the terms "military" and "civil" there is a wide distinction. "Military use" or "martial use", which may be considered for the present purpose as embracing "naval use", suggests the thought of physical force with destruction as its exclusive ultimate aim. It does not carry with it the idea of even constructive force. The bridge erected by the engineers is not a bridge for use by those engaged in peaceful civilian pursuits, but is a mere temporary expedient to be utilized in advancing while seeking out the enemy to destroy him.

Among other agencies of the Government created for the specific purpose of aiding in the prosecution of the war are the Office of Price Administration and the War Production Board, the underlying purpose of both being to combat financial inflation and resulting confusion on the home front. In addition to agencies of such nature, the regular civilian establishments of the Government are charged with responsibilities essentially related to the war effort. For example, upon the United States Attorney rests among other duties those of prosecuting persons charged with evading service in the armed forces and acquiring sites for training those called to such service.

It could hardly be contended that a typewriter or other supplies for use of any of those agencies is military or naval property of the United States or that it is moving for military or naval and not civil use.

If such a construction should be placed upon the Transportation Act, the words "and not civil" would have no meaning, although those words were obviously intended to have a meaning and were em-

---

[5] United States v. Jackson, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361; United States v. American Trucking Association, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; National Lead Co. v. United States, 252 U.S. 140, 40 S.Ct. 237, 64 L.Ed. 496.

ployed at a time and under circumstances indicating danger of war.

I am unable to draw a distinction under the Transportation Act between the status of fertilizer moving for use by a farmer in Cornwall or a farmer in Haiti under the Lend-Lease Act, and fertilizer moving for use by a farmer in the middle west furnished by the Government under appropriate provisions of the Agricultural Adjustment Administration. All are engaged in the production of agricultural products essential for the successful prosecution of the war. All are producing with fertilizer which moved as property of the United States; all are engaged in one of the most traditional of all civilian occupations, constituting the antithesis of destructive effort and as far removed from martial activities as can be imagined, and all are working to supply their respective markets with such surplus as may be available.

It is therefore my conclusion that the phosphate rock and superphosphate, within the meaning of the Transportation Act, was not military or naval property of the United States and was moving for civil use; that the counterclaim asserted by the Government should be dismissed and judgment should be rendered the plaintiffs in accordance with the prayer of the petitioner.

