### UNITED STATES v. POWELL et al.
### No. 5406.

Circuit Court of Appeals, Fourth Circuit.

Dec. 13, 1945.

Hubert H. Margolies, Atty., Department of Justice, of Washington, D. C. (John F. Sonnett, Asst. Atty. Gen., Harry H. Holt, U. S. Atty., of Hampton, Va., Walkley E. Johnson, Asst. U. S. Atty., of Belle Haven, Va., and Frederick Chait and Irvin M. Gottlieb, Attys., Department of Justice, both of Washington, D. C., on the brief), for appellant.

Thomas L. Preston, of Norfolk, Va. (W. R. C. Cocke and F. S. Sargeant, both of Norfolk, Va., on the brief), for appellees.

Before SOPER and DOBIE, Circuit Judges, and BARKSDALE, District Judge.

DOBIE, Circuit Judge.

This case involves only one question. Phosphates, owned by the United States (hereinafter called Government) were shipped over the Seaboard Air Line Railway (hereinafter called Seaboard), consigned to the British Ministry of War Transport under the Lend-Lease Act, for use as fertilizer by the farmers of Great Britain. Did these phosphates fall within the category "military or naval property of the United States moving for military or naval and not for civil use", as those words were used in Section 321(a) of the Transportation Act of 1940, 49 U.S.C.A. § 65(a)? The District Court decided this question in the negative and thus determined that Seaboard was en-

titled to collect from Government the full commercial freight rates, rather than the reduced rates specified for such property moving over Land Grant Railroads. Government has appealed.*

So far as it is pertinent here, Section 321(a) of the Transportation Act of 1940 reads:

"Notwithstanding any other provision of law, * * * the full applicable commercial rates * * * shall be paid for transportation by any common carrier subject to the Act of any * * * property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use * * * ."

To us, the opinion of Judge Hutcheson (60 F.Supp. 433) is so clear and its reasoning so cogent that we might well affirm the judgment below and adopt that opinion as the opinion of our Court. We shall content ourselves with a brief opinion.

█ Government contends that, at the time of the enactment of the Transportation Act, England was in a desperate plight in World War II, and that, since this titanic struggle involved and deeply touched the lives of all the citizens of a warring country, the phrase "military or naval" must be given a very broad meaning. With this we heartily agree. We also give cheerful assent to Government's assertion that the Lend-Lease Act was enacted as a defense measure, not as a program of humanitarian charity. But we cannot go along with Government's contention that, as a necessary consequence, all goods, regardless of their nature, function or use, shipped to England under the Lend-Lease Act were "military or naval property", "moving for military or naval and not for civil use", as these words were used in the Transportation Act.

█ The Transportation Act was passed before the Lend-Lease Act, 22 U.S.C.A. § 411 et seq. Sympathies in this country then ran strongly against the Axis powers; it was pretty generally agreed that we should help the enemies of the Axis; there was real fear that the United States might become involved in the conflict; swift measures for defense had to be perfected on an extremely wide scale. Yet, with this picture before it, we must presume that Congress deliberately used the words "military or naval" in their generally accepted meaning. And we cannot accept Government's statement that the words "not for civil use" in the Transportation Act were mere surplusage. On the contrary, we think those words clearly show a distinction (however difficult in practice) between the military or naval on the one hand, and the civil on the other hand. Had this not been the Congressional intention, appropriate words for that purpose were readily available.

An even stronger reason against the Government's contention is the fact that the whole history and administration of the Lend-Lease Act show definitely that two separate types of assistance were contemplated: (1) Military or naval; (2) civil. Nowhere is this more cogently shown than in the numerous reports of President Roosevelt to Congress on just what had been done in administering the Lend-Lease Act. On the strength of these reports, Congress continued to make further Lend-Lease appropriations and no amendment of the Transportation Act was made or sought.

A few items from these reports of the President (which could be indefinitely multiplied) must suffice. Thus Chapter 3 of the Fourth Report (pages 19-21) expressly divides Lend-Lease goods already shipped into three classes: (1) Military, (2) Industrial, and (3) Agricultural. A like classification is found in the Fifth Report (page 9). The same is true of the Seventh Report where (page 9) it is stated: "Exports of *military* items have arisen much more rapidly than exports of *non-military* items." (Italics ours.) The Third Report (pages 24-26) mentions the appearance of Lend-Lease Goods "on the grocers' shelves and in the kitchens of Great Britain," and states that 1,300,000 small children were receiving "a regular supply of

---

* In connection with this case, the following extract from United States Law Week, November 27, 1945, Volume 14, No. 20, may be of interest: "Conference Agrees on Land Grant Rate Repeal— Senate and House conferees last week unanimously adopted a report on H.R. 694, which would repeal land grant railway rates pursuant to which the United States, in return for vast grants of land to certain railroads, had been entitled to substantially lower freight rates than those charged to other shippers on such roads."

230

concentrated orange or black-currant juice, and of cod liver oil compound." The Tenth Report (page 20) mentions "supplies needed to prevent a breakdown of the *civilian* economy." (Italics ours.) Finally, in the Fifteenth Report (page 38) we find: "*Civilian* supplies shipped to French Africa under Lend-Lease. * * * We have sent to Tunisia and Morocco, for example, equipment to increase production of the phosphate mines. The fertilizer produced by these mines is needed both for the United Kingdom's intensive food production program and for the restoration of food production in the liberated areas of occupied Europe." (Italics ours.)

The last quotation seems to bear directly on the instant case. For here we have phosphate mines connected only with the production of fertilizer; the use of fertilizer associated with agriculture; the whole designated and included within the clear category of *Civilian supplies*.

The judgment of the District Court is affirmed.

Affirmed.