## SOUTHERN PAC. CO. v. DEFENSE SUPPLIES CORPORATION.

### No. 23495–G.

District Court, N. D. California, S. D.

Jan. 21, 1946.

C. W. Durbrow, Charles W. Burkett, Jr., and C. O. Amonette, all of San Francisco, Cal., for plaintiff.

Theodore R. Meyer, R. L. Miller, Joseph F. Hogan, and Brobeck, Phleger & Harrison, all of San Francisco, Cal., for defendant.

GOODMAN, District Judge.

During the years 1942 and 1943, defendant Defense Supplies Corporation shipped to itself from Seatte, Wash., to Los Angeles, Cal., via the railroads of plaintiff and other participating carriers and upon government bills-of-lading, certain tank cars of motor benzol. Defendant refused to pay plaintiff, as the delivering carrier, for such transportation at the commercial rates established under tariffs filed with the Interstate Commerce Commission. Instead it paid a lower rate, arrived at by deducting from the tariff rate certain so-called land grant allowances reserved to the United States under the Transportation Act of 1940 where "military or naval property of the United States" is transported for "military or naval and not for civil use," over the lines of those railroad companies that had received land grants from the United States. Transportation Act of 1940, c. 722, § 321, 54 Stat. 954, 49 U.S.C.A. § 65.

Prior to September 18, 1940, the United States was the beneficiary of freight rate deductions upon the transportation of any kind of government property that moved over railroads which had received land grants from the United States and over other railroads signing so-called "equalization agreements" in order to meet the land-grant railroad rates. Lake Superior & M. R. Co. v. United States, 93 U.S. 442, 23 L. Ed. 965; Atchison, T. & S. F. R. Co. v. United States, 15 Ct.Cl. 126; Act of June 7, 1924, c. 291, 10 U.S.C.A. § 1375; Powell v. United States, D.C., 60 F.Supp. 433, 435, 436.

However, by the Act of 1940, as to those carriers who theretofore released and quitclaimed to the United States the lands previously granted to them by the government, § 321(b), the land-grant deductions allowed the United States apply only to military or naval property of the United States moving for military or naval use.

All of the carriers participating in the transportation of the benzol, including plaintiff, were either land-grant aided roads or had entered into equalization agreements and all of such land-grant aided carriers had filed the releases required by the Act.

This action seeks the recovery of the sum of $23,049.51, being the amount of the deducted land-grant allowances.

If the benzol was, at the time of its transportation, military or naval property of the United States being moved for military or naval and not for civil use, plaintiff cannot recover. On the other hand, if the benzol was not military or naval property of the United States or if it was not transported for military or naval use, plaintiff should recover.

The cause was submitted upon briefs after the filing of a written stipulation of facts.

Plaintiff's first contention is that the motor benzol was not property of the United States because it was owned at the time by defendant Defense Supplies Corporation[1] which plaintiff claims to be an entity separate and distinct from the United States.

However, in none of the cases cited by plaintiff was it squarely adjudicated that property of which the United States was sole beneficiary was not its property because the naked title was held by a corporate instrumentality. On the other hand, in the following cases where property was carried in the names of corporate instrumentalities, such property was held to be government owned. Clallam County, Wash. v. United States, 263 U.S. 341, 44 S.Ct. 121, 68 L.Ed. 328 (Spruce Production Corporation); King County, Wash., v. United States Shipping Board Emergency Fleet Corporation, 9 Cir., 282 F. 950; United States Shipping Board Emergency Fleet Corp. v. Delaware Co., Pa., 3 Cir., 17 F.2d 40; United States v. Skinner & Eddy Corp., D.C., 28 F.2d 373; Cherry Cotton Mills Inc. v. United States, Ct.Cl., 59 F. Supp. 122 (Reconstruction Finance Corp.); Inland Waterways Corp. v. Young, 309 U.S. 517, 60 S.Ct. 646, 84 L.Ed. 901. Directly in point as to Defense Supplies Corporation is the case of Defense Supplies Corp. v.

[1] Created under the authority of Section 5d(3) of the Reconstruction Finance Corp. Act, 15 U.S.C.A. § 606b(3).

U. S. Lincs Co., D.C., 57 F.Supp. 291, decision of Judge Knox.

It is urged by plaintiff that Congress did not intend that the words "property of the United States" as used in the Transportation Act of 1940 should embrace property held in the name of corporate instrumentalities, because while in other regulatory statutes specific mention is made of "government owned or controlled corporations," such mention is not made in the Transportation Act of 1940. This argument, however, fails for the reasons given in Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784, and also because a true appraisal of the purpose and background setting of the Transportation Act of 1940 negates any imputation that Congress intended such an irrational or capricious objective as to deprive the United States of the rights and benefits attaching to ownership of its property held in the name of this particular instrumentality of government. Other arguments urged by plaintiff in this connection are not of sufficient substance to warrant further comment.

▇▇▇▇ Plaintiff's second contention is that the benzol transported was not military or naval property. Here is presented a question of first impression. Its resolution requires appraisement of the purpose and nature of defendant's powers and activities. During the period preceding the attack on Pearl Harbor and also subsequent thereto, various agencies of the government, corporate and otherwise, were established to acquire, produce and distribute material and commodities for use in the national defense and to further the successful prosecution of the war. Defendant was such an agency. § 5d(3), Reconstruction Finance Corp. Act, 15 U.S.C.A. 606b(3).

After Pearl Harbor, the government decided to and did acquire through defendant agency large quantities of benzol for use principally[2] in the manufacture of aviation gasoline and synthetic rubber tires for the armed forces. It is urged on behalf of plaintiff that in order to be classified as naval or military property, the benzol had to be acquired by the War or Navy Departments in the manner and by officers or agencies specially authorized by the Congress to act for such Departments and with

monies appropriated by Congress for that purpose. Viewed in the context and against the background of the Transportation Act of 1940, this is too narrow and illiberal an interpretation of the language of the Act.

It is true, as stated by plaintiff, that pursuant to its constitutional powers to raise and equip armies and navies, Congress has from time to time appropriated monies to acquire properties for the armed forces and has designated the officers authorized to so act, in the case of the Army, by 10 U.S.C.A. § 1191, and in the case of the Navy, by 34 U.S.C.A. § 560. It is also true that defendant corporation has no Congressional authority to make purchases for the Army or Navy Departments.

But it does not follow at all that, within the purview of the Transportation Act of 1940, property purchased and transported by the Defense Supplies Corporation may not be "military or naval property" of the United States. The words "military" and "naval" as used in the Act are descriptive adjectives. In context they may refer to property of the War or Navy Departments but they also properly and logically are descriptive, irrespective of ownership, of the nature of the property itself, with respect not merely to its tangible form and characteristics but as well, as is the case here, to the nature of its contemplated use. Having in mind the history of the "land grant allowance" legislation, it is clear to me that Congress did not intend to retain for the benefit of the United States reduced rates for the transportation only of property assigned to the War or Navy Departments and fit for immediate use and not for its property undeniably dedicated to military use but not yet assigned to the War Department because not at the moment in the ultimate form usable in actual conflict.

The powers granted by Congress to defendant (Charter clause 5) to acquire, produce and deal in materials and implements of war on a vast scale plainly indicate Congressional awareness of the advantageous facilities afforded by defendant agency in the handling of material necessitated by modern methods of warfare requiring total mobilization of resources. Moreover, the stipulation of facts recognizes that defendant, in acquiring and transporting the

---

[2] Approximately 87% of the total benzol shipped was used in the making of aviation gasoline and synthetic rubber tires for the armed forces. About 13% found its way incidentally and eventually into nonmilitary channels.

benzol, was functioning in cooperation with the naval and military establishments of the United States.

If the Army or Navy were at the time in question moving the benzol via plaintiff's railroad to the same refineries for the same purpose, plaintiff would not object to the claimed land grant allowance. This is so by the force of the very argument made that the statutory language limits the statutory benefit to military property of the War or Navy Departments. By this token, the benzol is none the less military property moving for military use, because of its control at the time by another lawful agency of the United States.

I conclude that the benzol was in fact military or naval property of the United States.

■ We now reach the final question raised, viz: Was the benzol "moving for military or naval and not civil use?"

Concededly, the United States would not be entitled to the reduced rate allowed by the statute even if the benzol were military or naval property, unless it also appeared that it was being transported for military and not civil use. This is so because the United States might very conceivably move military or naval property for purely civilian and nonmilitary use.

The term "military" is defined in Funk & Wagnall's New Standard Dictionary, in part, as "of or pertaining to soldiers, arms, or warfare * * * warlike * * * martial" Bouvier speaks of it as "anything pertaining to war or to the Army." Third Revision Vol. 2, p. 2209.

On the other hand "civil" is defined as "pertaining to a citizen in regard to ordinary affairs; opposed to ecclesiastical or military." (Funk & Wagnall.)

Thus the terms "military" and "civil" are mutually exclusive. The benzol here was to be manufactured into aviation gasoline and tires for the armed forces. It certainly did not pertain "to a citizen in regard to ordinary affairs." Its transportation was to a place where it was to be used in greatest part "pertaining to soldiers, arms or warfare." Its relationship to the physical force of conflict and combat was actual and proximate.

That the benzol had to be processed and other component material added does not, as contended, detract from its status as military property at the time of transportation. To fix its status according to the standards proposed by plaintiff would involve refinements of evaluation too speculative and too far removed from realities. At what point would its "military use" become an actuality? When the first drop was mixed with added material? When the manufacturing process was completed? When the first drum of gasoline or first tire started on their way? When the gasoline was syphoned into an airplane tank? Or perhaps not until the airplane had entered upon the performance of its mission?

The contention that the property was not moving for "use" but for sale to the processing oil refineries lacks merit, for the so-called "sale" to the refineries was but an intermediate step in the use.

There is, in my opinion, a final and persuasive basis for the court's interpretation of the terms "military property" and "military use" as expressed in the Act. Prior to the outbreak of World War II, a narrower and stricter meaning might well be attached to these phrases, because up to that time through the course of history, military and naval operations had restricted themselves to specific areas and theatres. Human ingenuity in waging war had been limited by space and distance. But after 1939, the horrors of unlimited total war became a certainty. At or about the time of the passage of the Transportation Act of 1940, many other statutes were enacted by Congress in the endeavor to prepare for our anticipated participation in the struggle.[3] Total mobilization required the creation of agencies to produce and gather the resources of war. Thus much material which in older days might have lacked the classical military habilaments became of vital military importance. Hence it is that a just and fair adjudication of the meaning of the statute's language cannot be made without considering the over all effect of the concept of total global warfare.

Judgment will go for defendant. Findings may be prepared and presented in accordance with the Rules.

---

[3] See notes to the opinion of Judge Hutcheson in Powell v. United States, D.C., 60 F.Supp. 433, as to the related legislation.