NORTHERN PAC. RY. CO. v. UNITED STATES.

No. 9043.

Circuit Court of Appeals, Seventh Circuit.

July 8, 1946.

Writ of Certiorari Granted Oct. 14, 1946.

See 67 S.Ct. 96.

L. B. laPonte and M. L. Countryman, both of St. Paul, Minn., for appellant.

John F. Sonnett and Hubert H. Margolies, Department of Justice, both of Washington, D. C., and Charles H. Cashin, U. S. Atty., of Madison, Wisc. (J. Francis Hayden, Sp. Asst. to the Atty. Gen., of counsel), for appellee.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

This suit was brought under the Tucker Act[1] to recover the difference between freight charges billed by the plaintiff at the full tariff rates and the amounts paid by

---

[1] 28 U.S.C.A. § 41(20).

the defendant at land grant rates for transportation of shipments of Government property. The parties entered into a stipulation of the facts which was adopted by the District Court as its findings of fact.

Judgment from which this appeal is taken was entered dismissing plaintiff's claim to recover freight charges on five shipments. The error relied upon is the District Court's conclusion of law that each of the five shipments was "military or naval property moving for military or naval, and not for civil use," and entitled to land grant rates under Section 321(a) Transportation Act, 1940, 49 U.S.C.A. § 65(a).

The facts as to the five shipments in controversy are as follows:

(1) Copper cable. In August, 1941, plaintiff and connecting carriers transported from Pawtucket, Rhode Island, to Tacoma, Washington, and delivered to consignee 15,780 pounds of insulated copper cable shipped by Inspector of Naval Material, United States Navy, Boston, Massachusetts, consigned to District Material Officer, 13th Naval District, % Seattle-Tacoma Shipbuilding Corporation, for Maritime Commission, Hull 123. The cable was furnished by the Navy Department for use in insulation of degaussing equipment (to neutralize magnetic mines) on Hull 123. Hull 123 was a single screw cargo vessel being built by the Seattle-Tacoma Shipbuilding Corporation under contract dated October, 1939, between said shipbuilding corporation and the Maritime Commission. In 1940, while the vessel was under construction, it was decided by the Navy Department and the Maritime Commission that all vessels under construction for the Commission should have degaussing equipment. Specifications for the degaussing equipment for Hull 123, later known as the S. S. Idaho, were furnished by the Navy Department which assumed and paid the cost of installation and all transportation charges. The Hull was delivered on September 8, 1941, and was operated as directed by the Maritime Commission or the War Shipping Administration.

(2) Lumber for construction of a munitions plant. In January and February, 1942, the plaintiff transported from plants in Washington to New Brighton, Minnesota, seven carloads of lumber shipped by various lumber companies, consigned to the United States Area Engineer, Twin Cities Ordnance Plant, % Foley Brothers, Inc., and Walbridge, Aldinger Company. The lumber was for the construction of the Twin Cities Ordnance Plant at New Brighton for manufacture of .30 and .50 caliber ammunition under a cost-plus-fixed-fee construction and operation contract entered into in July, 1941, by the War Department with the Federal Cartridge Corporation of Minneapolis, Minnesota. Foley Brothers, Inc., and Walbridge, Aldinger Company were sub-contractors for construction.

(3) Lumber for construction of pontoons. In May, 1943, plaintiff transported from Bucoda, Washington, to Minneapolis, Minnesota, 113,120 pounds of fir lumber shipped by Mutual Lumber Company, consigned to Depot Quartermaster, % Crown Iron Works, for United States Marine Corps. The lumber was shipped to be urea salts treated, kiln dried, milled and manufactured into trestle balks and pontoon balks, sills and chess, at Crown Iron Works pursuant to a contract with the corporation. The trestle and pontoon balks were shipped overseas for construction of a bridge for use in military operation or were used in construction of pontoon bridges and piers at Camp Lejeune, North Carolina, and Quantico, Virginia, for training combat engineers.

(4) Bowling alleys. On February 13; 1942, plaintiff and connecting carriers transported from Muskegon, Michigan, to Seattle, Washington, 29,037 pounds of bowling alley outfits, shipped by Inspector of Naval Material consigned to the Officer in Charge, Siems-Drake Puget Sound Company, Seattle, Washington, for reshipment to a Naval Air Base, Dutch Harbor, Alaska. The land on which the air base was constructed was reserved for Navy use. The alleys were procured on a contractor's purchase order and installed in a building at Dutch Harbor. The building was intended for a recreation center for the contractor's men and later as a recreation center for the military personnel at the station.

(5) Liquid paving asphalt. On January 26, 1942, plaintiff and connecting carrier transported from Richmond, California, to

Seattle, Washington, 1,259 barrels of liquid paving asphalt consigned to Civil Aeronautics Administrator, Alaska Project Warehouse, Seattle, Washington, for export. The asphalt was for use in constructing runways at an airport at Cold Bay, Alaska, under a program entitled, "Development of Landing Areas for National Defense," conducted by the Civil Aeronautics Administration. The land on which the airport was constructed at Cold Bay was owned by the United States and reserved for the use of the Navy by executive order. On December 15, 1941, Major General S. B. Buckner, Jr., Headquarters, Alaska Defense Command, Fort Richardson, Alaska, advised the Civil Aeronautics Administration that the field at Cold Bay was vital to the immediate defense of key points in Alaska, and in his letter of that day listing order of priority for the preparation of air fields in Alaska, he placed the Cold Bay project first in importance. At the time of the invasion of the Aleutians by the Japanese, the field at Cold Bay played an important part in the defense of Alaska. Bombers based at Cold Bay turned back the Japanese attack on Dutch Harbor.

The property was transported on Government bills of lading or commercial bills subsequently exchanged for Government bills. The amount claimed on five shipments is $3,569.75.

The District Court rendered an opinion holding that each of the above shipments was "military or naval property" within the meaning of Section 321, and from the judgment following this opinion, the Northern Pacific Railway Company appeals.

Prior to the passage of the Transportation Act of 1940, all property owned by the United States moved over land grant routes at land grant rates. From time to time, the Congress has passed legislation relieving the railroads of the obligation to give to the Government certain preferential treatment in rates.[2] The Transportation Act of 1940 carried this legislative tendency further. It provided in Section 321(a): "Notwithstanding any other provision of law, but subject to the provisions of sec-

tions 1(7) and 22 of the Interstate Commerce Act, as amended, the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier subject to such Act of any persons or property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use or to the transportation of members of the military or naval forces of the United States (or of property of such members) when such members are traveling on official duty."

█ At the time of the enactment of the Transportation Act of 1940, it was obvious that the general needs of security demanded a greatly expanded Army and Navy. Such enlarged military and naval forces would demand supplies and equipment far in excess of the then existing reserves. With the war spreading throughout Europe in 1940, and with the knowledge of the meagre and inadequate military strength of the United States, it is most unrealistic to presume that Congress intended any restrictive meaning of "military or naval property" as used in the Transportation Act of that crucial year. To define "military and naval property" in any narrow sense would be to close one's eyes to the complexities and realities of modern war. We will not impute to Congress such lack of vision.

█ We must remember that all government property moving over land grant railways moved at the reduced land grant rates before Section 321(a) was introduced. As originally drawn, Section 321(a) would have made all government property moving over land grant railways move at the regular commercial rates as paid on non-land grant railways. In the Interstate Commerce Committee of the Senate, an exception was inserted which retained the reduced land grant rates on "military or naval property of the United States moving for military or naval and not for civil use." The use to which the property was to be put was the controlling thing. If the prop-

---

[2] Act of July 16, 1892, 27 Stat. 174, 180; The Army Appropriation Act of June 7, 1924, 43 Stat. 486.

erty was to be used for military or naval purposes as distinguished from a civil use, the property was military and naval property within the meaning of the Act. We look to the use to which the property was to be put to determine its character for rate paying purposes.

 When this Act was passed, Congress was engaged in strengthening our defenses. War was imminent. Congress intended to save from the release of applicable land grant rates whatever of government property was shipped over land grant railways to be used by the United States in its military and naval security program. This exception was written for the benefit, not of the railroads, but of the United States, and will be liberally construed to carry out the intention of Congress. All property used for military or naval purposes was excepted from the whole category of government-owned properties that had theretofore enjoyed the low rates prevailing on land grant railways, and for these excepted properties the low rates were to continue. That the properties transported and here in question were used for military or naval purposes is apparent from a reading of the descriptions of the use to which they were put by the United States. Congress acted while total war raged in Europe and in contemplation of our situation if total war should come to us, which it did. Bowling alleys were used to maintain morale in the far-away Aleutian Islands where a post of our military and naval forces was established. An Army and Navy cannot long live and fight in foreign lands and waters without a merchant fleet in support, and the protection of that fleet by the use of copper cable is a military and naval purpose. Lumber to make pontoons for training and use of Marines, and materials to make arsenals, were all for military and naval uses. Any property the Government used to forward its total war effort was military or naval property, and if owned by the Government and transported over land grant railways, it was a kind of property Congress did not release from the low rates granted by the land grant railways.

Counsel cites Powell v. United States, D.C., 60 F.Supp. 433; Id., 4 Cir., 152 F.2d 228. In this case the United States had shipped phosphate to the British Ministry of Transport to be sent under lend-lease to Britain to be used by farmers there as fertilizer. The Court found that lend-lease goods were divided into three classes: (1) military, (2) industrial, and (3) agricultural. The use here was agricultural and civil as distinguished from military and naval.

 Plaintiff contends that the Transportation Act of 1940 is in pari materia with the Embargo Act of 1940, 54 Stat. 712, the Property Requisitioning Act of 1941, 50 U.S.C.A.Appendix, § 721 et seq., and the National Defense Act of 1941, 55 Stat. 655. Plaintiff further argues that since the description of "war materials" is more comprehensive in these Acts than in the Transportation Act, Congress necessarily intended to restrict the meaning of "military and naval property" as used in this Act. We disagree with both contentions. 1 Bouvier's Law Dictionary, Rawle's 3d Rev., p. 1523, defines "in pari materia" as "upon the same matter or subject." The doctrine is applicable when construing contemporaneous legislation concerned with a specific subject, such as appropriations,[3] railroad rates,[4] and taxes.[5] It is obvious that the Transportation Act of 1940, dealing with railroad rates, is not concerned with the same subject matter as other defense measures so as to call for the application of the rule. Furthermore, the rule of in pari materia is resorted to only in cases where the meaning of a statute is ambiguous or doubtful. District of Columbia v. Gladding, 49 App.D.C. 232, 263 F. 628; United States v. Colorado & Northwestern Railroad Company, 8 Cir., 157 F. 321, 330, 15 L.R.A., N.S., 167, 13 Ann.Cas. 893. No such situation is presented here.

It is ordered that the judgment of the District Court is

Affirmed.

[3] Converse v. United States, 21 How. 463, 62 U.S. 463, 16 L.Ed. 192.

[4] United States v. State of Louisiana, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181.

[5] First National Bank of Birmingham v. United States, D.C., 25 F.Supp. 816.