**NORTHERN PAC. RY. CO. v.
UNITED STATES.**
Civil Action No. 90.

District Court, W. D. Wisconsin.
Jan. 15, 1946.

**2**

Johnson, Fritschler & Barstow, of Superior, Wis., and M. L. Countryman, Jr., and L. B. da Ponte, both of St. Paul, Minn., for plaintiff.

Charles H. Cashin, U. S. Atty., of Madison, Wis., and John F. Sonnett, Acting Head, Claims Division, and Hubert H. Margolies, Atty., Department of Justice, both of Washington, D. C., for defendant.

STONE, District Judge.

This is an action commenced under the Tucker Act, paragraph 20 of Section 24 of the Judicial Code of March 3, 1911, 36 Stat. 1093 as amended, 28 U.S.C.A. § 41 (20), to recover from the defendant freight charges on interstate shipments of government property. Plaintiff submitted its bills to the defendant at published tariff rates. The defendant, claiming that land grant rates applied under Section 321 (a) of the Transportation Act of 1940, 49 U.S.C.A. § 65 (a), deducted the difference between the published tariff rates and the land grant rates, in some instances from the original bills and in other instances from subsequent bills.

The facts have been stipulated by the parties, and the Court adopts the stipulation as its findings of fact.[1]

The defendant denies liability and alleges that the shipments in dispute con-

---

[1] That part of the stipulation pertinent to the determination of the issues herein reads as follows:

"8. During the month of August, 1941, plaintiff, in connection with the New York, New Haven and Hartford Railroad Company, the Erie Railroad Company, and the Chicago and Northwestern Railway Company, transported on Government bill of lading N686622 from Pawtucket, Rhode Island, to Tacoma, Washington, in connection with contract NOs–88648, and plaintiff there delivered to the consignee 15,780 pounds of insulated copper cable shipped by the inspector of naval material, United States Navy, Boston, Massachusetts, consigned to District Material Officer, Thirteenth Naval District, c/o Seattle-Tacoma Shipbuilding Company for Maritime Commission, Hull 123.

"The insulated copper cable was furnished and transported by the Navy Department of the United States for the purpose of being used in the installation of degaussing equipment (to neutralize magnetic mines) on Hull No. 123. Hull No. 123 was a single screw cargo vessel built by the Seattle-Tacoma Shipbuilding Corporation pursuant to a contract entered into on October 9, 1939, between the Seattle-Tacoma Shipbuilding Corporation and the Maritime Commission of America.

"In accordance with the provisions of subsection (b) of Section 501 of the Merchant Marine Act of 1936, as amended (46 U.S.C. Sec. 1151(b) ) the plans and specifications for the construction of Hull No. 123 were submitted to the Navy Department for suggestions as to changes that should be made, in order that the vessel might be suitable for conversion into a military or naval auxiliary or suitable to the United States in time of war.

"In 1940, while this vessel was under construction, it was determined by the Navy Department and the Maritime Commission that all vessels under construction by the Maritime Commission should have degaussing equipment. Discussions between the Navy Department and the Maritime Commission resulted in the adoption of the following procedure for equipping Maritime Commission vessels under construction:

"Degaussing specifications would be prepared by the Navy Department and

stituted transportation of military or naval property of the United States moving for military or naval and not for civil use, within the meaning of said Section 321 (a) of the Transportation Act.

Plaintiff denies that the said shipments were military or naval property of the United States moving for military or naval and not for civil use, and contends that the defendant is not entitled to the land grant deductions it has taken on the shipments involved in this action.

Plaintiff has withdrawn its claim as set forth in paragraph 12 of the stipulation (paragraph IX of the complaint), and defendant has admitted liability to plaintiff on the shipment described in paragraph 7 of the stipulation (paragraph IV of the complaint). The total amount now claimed by plaintiff from the defendant in this action is $3,889.08.

That portion of the statute pertinent to these proceedings reads:

"Notwithstanding any other provision of law, * * * the full applicable commercial rates * * * shall be paid for transportation by any common carrier subject to (the Act) * * * of any * *

---

transmitted to the Maritime Commission for forwarding to the Commission's ship contractor. Responsibility was placed on the Maritime Commission to make all necessary arrangements with the shipbuilders in accordance with the specifications furnished by the Navy Department. All degaussing equipment was to be furnished by the Navy Department, including additional generating capacity where necessary. The cost of the equipment together with the cost of transportation was to be borne by the Navy Department. During the installation of the equipment the Navy Department would act in an advisory capacity, providing technical information whenever necessary.

"Specifications for the degaussing equipment for Hull No. 123, later known as the S. S. Idaho, were furnished by the United States Navy Department, which acted in an advisory capacity in the installation, and assumed and paid for the cost of the degaussing equipment and all transportation costs.

"Article 9 of the Maritime Commission contract covering the sale of the vessel reads in part as follows:

" 'Until the emergency declared by the President of the United States in a proclamation dated September 8, 1939, shall cease to exist, the vessel shall be operated to and from such port or ports and under such conditions as the Commission shall direct.' "

"9. During the months of January and February, 1942, plaintiff transported over its own line, on commercial bills of lading, from Longview, Whites, Everett, and Shelton, Washington, to New Brighton, Minnesota, and there delivered to the shipped by various lumber companies, consignee, seven carloads of lumber,

"Twin Cities Ordnance Plan at New consigned to the U. S. Area Engineer, Foley Brothers, Inc., and Walbridge, Aldinger Company, * * *.

"Twin Cities Ordance Plan at New

Brighton, Minnesota, was constructed for the United States, under authority of the Secretary of War, for the manufacture of .30 and .50 caliber ammunition pursuant to a cost-plus-fixed-fee construction and operation contract, Contract No. W-ord-527, entered into in July, 1941, with the Federal Cartridge Corporation of Minneapolis, Minnesota. The plant was constructed on a site furnished and made available by the Government, which is, and at all times has been, the owner of the plant facility known as Twin Cities Ordnance Plant. Foley Bros. and Walbridge, Aldinger Company, as a Joint Venture, were the authorized and approved subcontractors for the construction services. The plants were to have an average daily capacity based on twenty-four (24) hours of operation per day, of 2,000,000 rounds of caliber .30 ammunition and 600,000 rounds of caliber .50 ammunition. By supplemental contract in January, 1942, the plant was expanded to provide a capacity of 5,000,000 rounds of caliber .30 and 1,600,000 rounds of caliber .50.

"Construction of the plant project was under the supervision of the Quartermaster Corps, United States Army, from July 17, 1941, to December 15, 1941. Thereafter, all construction work at the Project was under the supervision of the Corps of Engineers, United States Army. The plant was constructed in three parts, known as Plant 1, Plant 2, and Plant 2 Expansion. The buildings of Plant 1 were constructed largely of steel, brick and concrete and were substantially complete on or about June 30, 1942. Plant No. 2 and Plant No. 2 Expansion were started January 7, 1942, and completed on or about January 15, 1943. They consisted of several large manufacturing buildings with the necessary additional buildings, all of wood construction.

"The Purchase Orders for lumber for the construction of Plant No. 2 and Plant 2

property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use * * *."

There is only one question for this Court to decide, and that is: Were the shipments of the government property described in the complaint and stipulation military or naval property moving for military or naval use and not for civil use?

The term "military use" will be considered for the present purpose as embracing naval use.

Webster's New International Dictionary, 2nd Edition, unabridged, defines the words "military" and "naval" as follows:

"Military"—"of or pertaining to soldiers, arms, or war; belonging to, engaged in, or appropriate to, the affairs of war; according to the methods and customs of war or of armies";

---

Expansion were issued against Purchase Allocations issued by the Office, Chief of Engineers, Washington, D. C. As contractors for the project Foley Bros., Inc., and Walbridge, Aldinger issued requisitions for purchase of the amounts of lumber they estimated would be required. On receipt of such requisitions the Area Engineer advised the Office, Chief of Engineers, as to such requirements. That Office issued allocations therefor, and on receipt of such allocations, the contractor issued Purchase Orders to Vendors.

"All of the lumber shipments in question were used in the construction of Plant 2 and Plant 2 Expansion. Title to all work completed or in the course of construction, and title to all materials, vested in the Government when designated by its Contracting Officer, and the Government reserved the right to furnish any materials necessary for the completion of the work. The Office, Chief of Engineers, acted as a central procuring agency for lumber used in the construction of the ordnance plant and issued allocations for the purchase of said lumber. Since January, 1943, the ordnance plant has been engaged in the manufacture of .30 and .50 caliber ammunition for use by the armed forces of the United States in the present emergency."

"10. On or about May 10, 1943, plaintiff transported over its own line of railroad on Government bill of lading No. M–121708–43 from Bucoda, Washington, to Minneapolis, Minnesota, and there delivered to the consignee, 113,120 pounds of fir lumber loaded in car No. PLE 46525, shipped by Mutual Lumber Company, consigned to Depot Quartermaster, Aaron Carlson care Crown Iron Works, at Minneapolis, Minnesota, for United States Marine Corps.

"The lumber was shipped to be urea salt treated, kiln dried, milled and manufactured into trestle balks and ponton balks, sills, and chess at the Crown Iron Works at Minneapolis. The balks, sills and chess are necessary members of a certain type of ponton or demountable floating bridge required to move military personnel and vehicles of war across water barriers. The trestle and ponton balks manufactured from the lumber shipped in Car No. PLE46525 are now overseas in connection with military and naval operations or have been used in construction of ponton bridges and temporary piers used at Camp Lejeune, North Carolina, and Quantico, Virginia, for training of combat engineers."

"11. On or about February 13, 1942, plaintiff and its connecting carriers, the Grand Trunk Railroad and the Chicago and Northwestern Railway Company, transported on Government bill of lading No. N–845519 from Muskegon, Michigan, to Seattle, Washington, and plaintiff there delivered to the consignee, 29,037 pounds of bowling alley outfits loaded in Milw. Car No. 6054, shipped by Inspector of Naval Material consigned to the Officer in Charge, Siems-Drake Puget Sound Company, Seattle, Washington, for reshipment to Naval Air Base, Dutch Harbor, Alaska, Contract NOy3570. On or about February 26, 1942, the said equipment was received by the Alaska Steamship Company for transportation on the ship Mt. McKinley to Dutch Harbor, Alaska.

"Contract NOy3570 was entered into pursuant to the provisions of the Acts of April 25, 1939 (53 Stat. 590) and May 25, 1939, (53 Stat. 757, 772) authorizing the construction, development and increase of naval aviation bases in various designated areas, including Alaska. The basic contract covered construction of Naval Air Bases at Kodiak, Alaska, and Sitka, Alaska. The work covered by the basic contract was later augmented by various supplemental agreements and change orders which increased the scope of the contract. Supplemental agreement No. 4 extended it to cover Dutch Harbor by adding an air base at Unalaska. The actual location of this station was at Dutch Harbor which was situated on Amaknak Island across the channel from the town of Unalaska. At

"Naval"—"of or pertaining to ships or shipping; of or pertaining to or connected with, possessing or characteristic of vessels of war or a navy".

Black's Law Dictionary, 2nd Edition, at page 778, defines military as "pertaining to war or to the army; concerned with war."

█ The times, circumstances and conditions must all be considered in determining whether property is used for a military purpose. In times of war, the concept of "property for military use" takes on a wider range than in times of peace. Property which in times of peace or under ordinary conditions is usable for "non-military" purposes, must be considered in times of war "military" when it is used for a military purpose. The test is whether the foremost purpose which the shipment is designed and intended to serve is a military purpose, and whether the civilian use is more than incidental.

█ Military property includes all property of every kind and description intended for and used in connection with the con-

the inception of the work at Dutch Harbor a portion of Amaknak Island was already designated as a Naval reservation. By Executive Order 8786, all of the public lands, subject to existing rights, were reserved for the use of the Navy Department for Naval aviation purposes. Since October, 1941, the entire island has been a military reservation and all non-military personnel and activities have been excluded therefrom.

"Article 22 of the contract provides that 'Only such commissary, recreational, and amusement facilities as may be approved by the Contracting Officer shall be installed or located on the various sites of the work under the contract. No such facilities shall be operated on a profit-making basis.' ' The alleys were procured on contractor's purchase order, approved by the Resident Officer in charge. They were installed in a semi-permanent wood-construction building at Dutch Harbor. This building was constructed under the authorization of Article 22 of the contract with the approval of the Contracting Officer and the Officer in Charge. The building was originally intended to serve first as a recreation center for the contractor's men and then as a recreational center for military personnel occupying the station, a procedure that was adopted as an economy measure to eliminate the expenditure of additional funds to provide recreational facilities for military personnel. Actually, the structure was completed at about the time (December, 1942) that all civil workmen were evacuated from the station, the construction work was taken over by the Seabees, and the facilities were never used by civilians.

"The construction work performed by civilian employees of the contractor was considered essential by the Navy Department. Due to remoteness, rough weather, difficult working conditions and boredom in off-hours, it was very difficult to keep civilian employees on the job. Despite recruitment under agreement whereby workmen had to pay their own transportation back to the states if they quit before the contract was terminated, the labor turn-over was inordinately high. The average stay of civilian workmen on the job was only 63 days. The recreation hall and theatre were projected and constructed for the purpose of expediting completion of the necessary military and naval installations.

"The contractor was a joint venture comprised of Siems-Spokane Co., Johnson Drake and Piper, Inc., and Puget Sound Bridge and Dredging Co., organized for the sole purpose of performing work under contract NOy3570. It performed no work other than that covered by the contract. Control of movement of materials from the island was at all times under the control of the military authorities and construction was entirely under control of the Resident Officer in Charge."

"13. On or about January 26, 1942, plaintiff and its connecting carrier, Southern Pacific Railroad Company, transported on Government bill of lading No. CCA–8918 from Richmond, California, to Seattle, Washington, 1,259 barrels of liquid paving asphalt loaded in eight cars and weighing, with dunnage, 604,365 pounds, shipped by the Standard Oil Company of California consigned to the Civil Aeronautics Administrator, Alaska Project Warehouse, 219 Terry Avenue North, Seattle, Washington, and marked 'For Export,' * * *.

"The symbol 'DLAND – Supplemental – 1942' appearing on the second line of the bill of lading identifies this asphalt as having been purchased and shipped for use in connection with an airport project under a program entitled 'Development of Landing Areas for National Defense' carried on by Civil Aeronautics Administration. The symbol '9–206,' also appearing on the second line of the bill of lading identifies this particular shipment as being for use in connection with the airport project at Cold Bay, Alaska. The paving asphalt was used for the construction of the airport at Cold Bay,

duct of the war. Modern science has changed weapons of warfare. Many articles and substances once considered unimportant for a belligerent purpose have become necessary and useful in the prosecution of the war. Military or non-military articles can be properly classified only after appropriate consideration has been given to the pressure and exigencies of the time, the current needs and circumstances of its use. Fishing tackle for use by vacationists is civil property, but manifestly becomes military when packed in a life raft for use by airmen downed at sea. Copper cable, as such, is not necessarily military property. However, under particular conditions of war or defense, it may become indispensable to military functioning when owned by the United States and devoted to a war use. It then acquires the character of military property.

■ The shipment of bowling alley equipment was originally intended to serve as a recreation center for the civilian employees of the contractor and later as a recreation center for military personnel occupying the station. The construction work performed by the contractor and his men was essential to the war effort and was so regarded by the Navy Department. The remoteness of the station in Alaska, the disagreeable weather, difficult working conditions, and the boredom of off-hours necessitated special measures to keep the employees satisfied and willing to remain at the station. The structure which was to house the bowling alley was completed in December, 1942, when all civilian workmen were evacuated and the construction work was taken over by the Seabees. At Dutch Harbor, where the alleys were installed, the lands and buildings are all owned by the United States and operated as a naval establishment, and all non-military activities are excluded. Clearly the alleys fulfilled a military function in maintaining the effi-

Alaska, in place of concrete, which is unsuitable to the terrain. Unlike most DLAND projects which are built on land owned by states, counties, cities and other political subdivision, the airport at Cold Bay was built without sponsor on public lands owned by the United States and reserved for the use of the Navy Department by Executive Order No. 5214, dated October 30, 1929.

"Funds for the construction of the airport were derived from appropriations made for 'Development of Landing Areas for "National Defense"' under various appropriation acts passed by the 76th and 77th Congress. These appropriations were for 'the construction, improvement and repair of public airports and public landing areas in the United States and its territories and possessions, determined by the administrator, with the approval of a Board composed of the Secretary of War, Secretary of the Navy, and Secretary of Commerce to be necessary for national defense. * ⁂ *' The determination for an airport at Cold Bay, Alaska, was made by the administrator and duly approved by the Board. Installations at landing areas were built at the request of or in consultation with the War or Navy Department, and in accordance with the desires of the Alaska Defense Command. In the winter of 1941–42, the Alaska Defense Command considered Cold Bay the most important field in Alaska and urged its completion at the earliest possible moment. On December 15, 1941, Major General S. B. Buckner, Jr., from the Headquarters Alaska Defense Command, Fort Richardson, Alaska, advised the Civil Aeronautics Administration that the field at Cold Bay was 'vital to the immediate defense of key points in Alaska' and in a letter of that day listing the order of priority for the preparation of airfields in Alaska he placed the Cold Bay project first in importance.

"Stripping and grading operations were commenced in August, 1941. At this time the situation in the Pacific was critical. After one of the runways had been graded, the War Department began the second runway with troop labor. Soon after, and prior to the completion of the contract, and on or about May 30, 1942, the contractor was ordered to vacate the site and the project was taken over by the Army. The War Department took over all the asphalt, expanded the runway length from 5,000 to 7,500 feet, and finished the job. The War Department has since been in complete control of the field, which is now known as Fort Randall. The Army has operated and maintained the landing area and the radio facility constructed by CAA at the same time.

"At the time of the invasion of the Aleutians by the Japanese, the field at Cold Bay played an important part in the defense of Alaska. The unexpected appearance of bombers based at Cold Bay turned back the Japanese attack on Dutch Harbor shortly after the contractors were ordered to vacate the site. The Cold Bay project had been kept secret because of the military situation."

ciency, morale and physical fitness of the military men at this remote outpost, and are military or naval property, and were moved in interstate commerce for military and not for civil use.

■ In May, 1943, plaintiff transported to Minneapolis, Minnesota, consigned to the Depot Quartermaster for the United States Marine Corps, the lumber referred to in paragraph 10 of the stipulation for manufacture into trestle and ponton balks for use of the United States Marine Corps. The lumber used in the manufacture of the trestle and ponton balks was carefully selected, assembled and shipped by the Marine Corps. The trestles and balks manufactured from the lumber are components of pontons or demountable floating bridges required to move military personnel and vehicles of war across water barriers. Some of the trestle and ponton balks so manufactured were shipped and used in military operations overseas, and some were used for training of combat engineers at Camp Lejeune, North Carolina, and at Quantico, Virginia. The lumber used to manufacture these components was unquestionably military property.

■ In August, 1941, when our involvement in the war was imminent, plaintiff transported for the Navy Department to Tacoma, Washington, in interstate commerce, insulated copper cable for use by the Navy in the installation of degaussing equipment on Hull No. 123, a cargo vessel later known as the S. S. Idaho. Hull No. 123 was built pursuant to a contract entered into on October 9, 1939, between the shipbuilding company and the Maritime Commission. In accordance with Section 501 (b) of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1151 (b), the plans for the construction of Hull No. 123 were submitted to the Navy Department for changes necessary for the vessel to be readily converted into a military or naval auxiliary. While this vessel was under construction in 1940 the Maritime Commission and the Navy Department agreed that all vessels under construction by the Maritime Commission, as this one was, should have the defense feature, the degaussing equipment, to counteract magnetic mines. The Navy Department furnished the specifications for this equipment and paid for its installation on Hull No. 123 as a necessary defense measure. This vessel so equipped was essential to and was used in the conduct of the war. The copper cable comes within the category of military or naval property.

In January and February, 1942, the plaintiff transported lumber purchased and shipped by defendant in interstate commerce to New Brighton, Minnesota, consigned to the United States Area Engineer, Twin Cities Ordnance Plant, to be used in the construction of buildings for the Twin Cities Ordnance Plant on land owned by the United States Government. The construction was done under the authority of the Secretary of War, and under the supervision of the Corps of Army Engineers. The plant was to be used to manufacture .30 and .50 caliber ammunition pursuant to a cost-plus-fixed-fee contract. The ordnance plant then in operation was engaged in the manufacture of .30 and .50 caliber ammunition for our armed forces. The lumber was shipped and used for a specific purpose—to construct a public arsenal which would provide more small arms ammunition for the army. The arsenal produced nothing but ammunition for the defendant.

■■ It is a matter of common knowledge that at the outbreak of the war the productive capacity of the commercial producers of ammunition in the United States was inadequate. The urgent requirements of the army necessitated a rapid expansion of government-owned facilities to supplement the existing arsenals. These plants, known as "government-owned and contractor-operated arsenals," were operated under the supervision of the ordnance department. The Twin Cities Ordnance Plant was a public arsenal. Its construction served a military purpose only and the lumber shipped for use in its construction was military property.

■ In January, 1942, plaintiff transported liquid paving asphalt consigned to the Civil Aeronautics Administrator, Seattle, Washington, and marked "For Export." The asphalt was shipped for use in the construction of the runways of the airport at Cold Bay, Alaska, built with United States' funds on public lands reserved for the use of the Navy Department. History discloses that the Cold Bay airfield, now known as Fort Randall, was a vital defense of key points in Alaska, and when the Japanese invaded the Aleutians, American bombers, based at Cold Bay, Alaska, repulsed the enemy attack aimed at Dutch Harbor. The construction of this air field

**8**

as a national defense was a military project, and the asphalt was military property.

Plaintiff's counsel have cited, in support of its claims, the case of United States v. Powell et al., 4 Cir., 152 F.2d 228. The issues in that case are readily distinguishable from those involved in this action. The shipment in the Powell case was phosphates owned by the United States and shipped to the British Ministry of Transport under the Lend-lease Act, 22 U.S.C.A. § 411 et seq., for use as fertilizer by the farmers of Great Britain. The Court found, in accordance with the facts, that lend-lease goods were divided into three classes—(1) military, (2) industrial, and (3) agricultural—and that the fertilizer was agricultural and not military property. All the shipments in issue in this action were required and used in the defense of the United States and in the furtherance of its war effort, and were shipments of military or naval property of the United States, moving for military or naval use and not for civil use.

After the commencement of this action, plaintiff withdrew its claim against the defendant as set forth in Paragraph IX of the complaint, in the sum of $36.33, and defendant admitted liability on plaintiff's claim described in paragraph IV of the complaint, in the sum of $319.33.

Plaintiff is entitled to judgment against the defendant on the claim described in paragraph IV of the complaint, in the sum of Three Hundred Nineteen and 33/100 Dollars ($319.33), and its prayer for judgment on all other claims in the complaint is denied.